[No. C064475. Third Dist. May 10, 2012.]

RANDY RAND, Plaintiff and Appellant, v.
BOARD OF PSYCHOLOGY, Defendant and Respondent.

---

## Counsel

Law Offices of David Carico and David Carico for Plaintiff and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Jose R. Guerrero, Kerry Weisel and David Carr, Deputy Attorneys General, for Defendant and Respondent.

Leslie Ellen Shear and Stephen Temko for Association of Certified Family Law Specialists as Amicus Curiae.

---

## Opinion

**MAURO, J.**—Psychologist Randy Rand filed a petition for writ of administrative mandamus challenging the authority of the Board of Psychology (Board) to discipline him for unprofessional conduct, gross negligence, violation of laws governing the practice of psychology, and dishonesty. (Bus. & Prof. Code, § 2960, subds. (i), (j), (k), (n).)[1] The trial court entered judgment denying his writ petition.

Rand contends on appeal that (1) the Board lacked jurisdiction to discipline him for his conduct as a special master because (a) he was acting in a judicial capacity and (b) he was not acting as a psychologist; (2) he was denied due process of law because (a) he was not given fair notice of prohibited conduct and (b) there was no logical nexus between the Board's findings and unfitness to practice the profession; and (3) the Board's factual findings do not support a determination that he was dishonest.

---

[1] Undesignated statutory references are to the Business and Professions Code.

We conclude that (1) the Board had jurisdiction to discipline Rand for his conduct as a special master because Rand was acting as a psychologist in his special master role; (2) Rand's due process contentions fail because (a) the rules, standards and guidelines for psychology practice gave him fair notice of prohibited conduct and (b) Rand failed to meet his burden of showing that there is no logical nexus between his unprofessional conduct and his fitness to practice the profession; and (3) substantial evidence supports the trial court's findings that Rand was dishonest.

We will affirm the judgment.

## BACKGROUND

The Board disciplined Rand based on his unprofessional conduct in two different court proceedings. In the first, Rand was a special master in a family law matter in California, and in the second, he telephonically testified under oath in a family law proceeding in Florida.

Rand was appointed as a special master in a high-conflict divorce proceeding between Loyal Davis and Jennifer Ives in Sonoma County, California. Davis and Ives had "ongoing issues" concerning visitation, and according to the special master agreement between the parties, Rand was appointed to assist them " 'based upon [his] expertise . . . as a court-appointed expert and license[d] mental health professional.' " Rand was to make decisions regarding matters such as dates, times, and methods of delivery of the children; sharing of vacations and holidays; participation by relatives in visitation; health care management; and communication with the children during non-custodial times. He was prohibited from making any orders affecting the court's exclusive jurisdiction to determine fundamental issues of custody and visitation, and could not make any orders altering or awarding physical or legal custody.

As the Board stated, and the trial court reiterated: "Special masters are generally used in high-conflict family law cases. One or more of the parties is likely to be combative, adversarial and difficult to deal with. The special master must remain neutral and impartial. The special master must avoid the appearance of favoring one side or the other or appear to align himself with one side or the other." Rand failed to do so.

Early in his tenure as special master, Rand became frustrated with Ives, accused her of trying " 'to pull one over on [him],' " and essentially called her a liar. He told her he no longer trusted her and informed her she would have to corroborate everything to him. Rand e-mailed Ives that he could not work with dishonesty and incorrectly accused her of perjury.

Ives wrote Rand a letter outlining her grievances against him and asked him to resign as special master. Rand felt he "did not need the aggravation that comes with defending the grievance" and agreed to enter into confidential negotiations with Ives's attorney, Alan Silverman, concerning withdrawing as a special master. Rand was willing to resign but conditioned his resignation on Ives withdrawing her grievance against him. Rand asserted that if Ives pursued her grievance he would vigorously defend himself, his defense would not portray Ives in a favorable light, and she should think twice before making him defend himself. If Ives withdrew her grievance, however, then Rand would resign and state that he was doing so for the best interest of the children. If questioned by Davis, Rand would tell him he was not at liberty to disclose the reason for his withdrawal but that he should trust Rand's decision.

Ives wanted a clause in the agreement that permitted her to reinstitute her grievance if Rand made any future disclosures about her to Davis or the court. When Silverman told Rand that any waiver of Ives's grievance would have to be conditional, Rand stated she was unreasonable and he declined to resign.

Ives retained Frank Dougherty, who is licensed as a psychologist and attorney and had experience as a special master, to represent her on the limited issue of her grievance and to negotiate Rand's resignation. Dougherty sent Rand a formal association of counsel form, and also obtained approval from Davis's lawyer, Bruce Schwartz, to contact Rand. A conference call was scheduled between Rand and the attorneys to discuss the grievance, but Rand refused to permit Dougherty to participate. Rand stated that regardless of Dougherty's standing in the case, he would only speak with Silverman and Schwartz.

Dougherty wrote Rand a letter stating that based on Dougherty's experience as a forensic psychologist and special master in many family law cases, he found Ives's grievance meritorious, at least in part. Dougherty outlined the ways in which Rand's performance as a psychologist acting as a special master had been deficient, and observed that the focus of the case had shifted from resolving conflicts between the parents to resolving conflicts between Ives and Rand. Dougherty explained that Ives was not interested in ruining Rand's career by pursuing her complaint through the Board and she preferred addressing the matter informally. She requested that he resign immediately, issue no further orders, and agree to disqualify himself from offering any expert opinion related to custody matters in the case.

On June 1 and June 9, 2004, Rand participated in a conference call with Davis and Schwartz concerning Ives's grievance against Rand. On June 9, he

sent an e-mail to Silverman stating, " 'I have given several warnings and demands, I do not want any communication from or with Dr. Dougherty and I have the authority and discretion to communicate or not with any attorney in this matter, regardless of a standing of "association" to you as attorney representing [Ives]. When I can, I'm asking for a restraining order.' "

In August 2004, Dougherty substituted in as Ives's attorney for all purposes. However, at a court hearing a few months later, Rand stated under oath that he would not meet with or discuss the case with Dougherty.[2] He consistently refused to speak with Dougherty but continued to speak with Schwartz. For several years, Rand communicated with Davis and his attorney by telephone, refused to speak with Ives's attorney, and communicated with Ives by e-mail only. He communicated comfortably with Davis at hearings, but refused to speak to Ives.

Later in the Sonoma County proceeding, and while still acting as a special master, Rand pursued a monetary claim against Ives based on her failure to pay her share of his special master fees. To recover on his claim, Rand filed a lien against property Ives owned in New Hampshire, and to assist him in this endeavor, he hired an attorney who had represented Davis against Ives in a custody matter there.

The Board ruled that based on clear and convincing expert testimony, Rand's conduct constituted an extreme departure from the standard of practice for a psychologist acting as a special master. The Board found that it is necessary for a special master to be impartial and to preserve the appearance of impartiality, but Rand treated the parties disparately, and did not make the appropriate effort to appear unbiased or to resolve his differences with Ives. Furthermore, he negotiated with Ives not to file a complaint with the Board. The Board concluded that cause for disciplinary action existed due to Rand's general unprofessional conduct, gross negligence, and violation of laws governing the practice of psychology. (§ 2960, subds. (j), (k).)

---

[2] In the underlying dissolution action in Sonoma County, Ives made several motions to remove Rand on the ground of bias, which were denied by the trial court. Ives appealed from the orders and the First District Court of Appeal's unpublished opinion is part of our appellate record. (*In re Marriage of Davis* (Nov. 30, 2006, A109310) [nonpub. opn.].) (Cal. Rules of Court, rule 8.1115(b).) The appellate court dismissed Ives's appeals as being taken from nonappealable orders. However, the court noted that the trial court's reluctance to address some of the "extraordinary aspects" of Ives's allegations was "troublesome." It also stated that "the record before us raises some concerns about Rand's ability to continue in his role as special master," and suggested that the trial court "take a more active role in these matters" and "take a fresh look at the efficacy of its decision to continue to utilize Rand's services in light of the seriously problematic relationship between him and Ives."

The other case that formed the basis for Rand's discipline involved a child custody proceeding in Florida state court. The father had sole custody of the child and the mother sought to change the custody status. A child custody evaluator concluded that the child was alienated from the mother and recommended counseling for the child with Dr. Robert Evans, a licensed school psychologist.

At a custody hearing, Evans testified that he believed the child needed to participate in a parental alienation program designed by Rand, who was an expert in the area of parental alienation syndrome. During the hearing, the judge telephoned Rand, placed him under oath, and questioned him about the intervention protocol proposed by Dr. Evans. Rand discussed the origins of his program, how it worked and the goal of the process. It involved reunifying a noncustodial parent with a child who had become alienated from the noncustodial parent and idolized the custodial parent. Rand developed the program "by trial and error" after he noticed similarities between alienated children and children who had been abducted and brainwashed by a cult. His program required that custody be given to the noncustodial parent, that the child be forced to participate in a retreat with the parent, and then go "home with the previously rejected parent" as a "permanent arrangement."

The judge asked Rand his opinion as to whether or not the child in the Florida case should go through the intervention process. Rand opined that the child was severely alienated and, " 'for the child's best interest,' " custody should be changed permanently to the mother and the child should go through the intervention program. Rand's opinion was based on the reports of other professionals and he "did not explain to the court the probable impact on the reliability and validity of his opinions of his not having personally interviewed or evaluated the child."

The Board found that Rand's conduct was an extreme departure from the standard of practice of a psychologist. The Board determined that Rand offered an opinion about a characteristic of a child whom he had not interviewed or evaluated, concluded that the child was severely alienated, and made a custody recommendation without stating the limitations of his opinion. The Board found that the judge was not speaking hypothetically when he asked Rand his opinion, and Rand did not answer hypothetically. The Board concluded that cause for disciplinary action existed due to Rand's unprofessional conduct, gross negligence, and violation of the rules of professional conduct and laws governing the practice of psychology. (§ 2960, subds. (i), (j), (k).)

Furthermore, when the Board investigated the matter, Rand advised the Board he had only a " 'very peripheral involvement' " in the case and stated

that the judge called him " 'for the sole purpose of inquiring about generic information pertaining to a program [that he] developed.' " This was not true. According to the Board's experts, Rand's role in the Florida court case was not peripheral; he testified under oath as an expert, opined the child would benefit from his parental reunification program, and made a custody recommendation. Moreover, if the court had ordered an intervention, Rand would have performed it with the child and mother and would have trained the child's therapist in his reunification technique. The Board found that Rand's attempt to minimize his role in the Florida proceedings constituted dishonesty, which was a cause for discipline under section 2960, subdivisions (i), (k) and (n).

The Board revoked Rand's license but stayed the revocation for five years upon various terms and conditions, including that his practice be conducted subject to the oversight of a practice/billing monitor. In addition, the Board ordered Rand to complete 30 hours of course work in forensic psychology and a course in law and ethics as they relate to the practice of psychology.

Rand filed a petition for writ of administrative mandamus challenging the Board's decision on multiple grounds. He contended the Board exceeded its jurisdiction in disciplining him for conduct in his role as a special master because that role was not the practice of psychology, and any alleged misconduct did not violate a specific statute or regulation pertaining to Rand's competence to practice psychology. Rand also maintained that the Board was equitably estopped from bringing the disciplinary action against him because it had a policy of not pursuing complaints against court-appointed special masters, and instead deferred to the superior court to remove a special master for any misconduct. Rand alleged that he reasonably relied on this policy to his detriment.

In a related argument, Rand asserted that he was deprived of due process of law when the Board disciplined him for his conduct as a special master because he did not receive adequate notice that his activities were subject to the Board's jurisdiction before it retroactively changed the applicable standards. He contended that none of the ethical rules governing psychologists contain any provisions notifying him that they pertained to special masters. Rand maintained that the Board's conduct disciplining him for his activities as a special master violated the separation of powers doctrine because the Board interjected itself into the family court process and undermined Rand's findings and recommendations by disciplining him. In addition, Rand argued that the weight of the evidence did not support the Board's factual findings and legal conclusions.

The trial court, exercising its independent judgment, upheld the Board's decision. It found that Rand was engaged in the practice of psychology while

he was acting as a special master, and the weight of the evidence supported the Board's determination that he engaged in unprofessional conduct, was grossly negligent, and violated the legal standards governing psychologists.

The trial court ruled that the Board was not estopped from disciplining Rand because the evidence did not support Rand's claim that the Board had a policy of not disciplining the licenses of special masters based on their conduct within the context of the family court process where their conduct failed to meet professional standards for licensed psychologists. The Board simply would not discipline special masters based on their substantive orders and recommendations. Accordingly, the trial court ruled that Rand's due process argument also failed because the Board did not retroactively change the standards applicable to him or discipline him without adequate notice. The trial court determined that the Board did not violate the separation of powers doctrine because it did not discipline him for his substantive decisions, but rather for his unprofessional conduct toward the parties. Thus, the Board did not interfere with matters that properly belonged within the judicial sphere.

As for the Florida custody case, the trial court found that the weight of the evidence supported the Board's findings that Rand's conduct was unprofessional, grossly negligent and dishonest. Accordingly, the trial court denied the petition for writ of administrative mandamus.

## STANDARD OF REVIEW

When an administrative decision substantially affects a fundamental vested right, such as the revocation of a professional license or the right to practice one's profession, the independent judgment standard of review applies. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789 [72 Cal.Rptr.2d 624, 952 P.2d 641]; *Evans v. Department of Motor Vehicles* (1994) 21 Cal.App.4th 958, 967, fn. 1 [26 Cal.Rptr.2d 460].) The superior court examines the administrative record for errors of law and exercises its independent judgment upon the evidence "in a limited trial de novo." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; see *Evans v. Department of Motor Vehicles, supra*, 21 Cal.App.4th at p. 967, fn. 1.) The superior court resolves evidentiary conflicts, assesses the witnesses' credibility, and arrives at its own independent findings of fact. (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45 [84 Cal.Rptr.2d 690].)

On appeal, we do not exercise our independent judgment. We review the trial court's findings under the substantial evidence test and determine whether substantial evidence supports the trial court's conclusions. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d

693]; *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659–660 [53 Cal.Rptr.2d 4].) We must resolve all conflicts in the evidence, and indulge all reasonable inferences, in favor of the superior court's judgment. (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]; *Barber v. Long Beach Civil Service Com., supra,* 45 Cal.App.4th at p. 659.) However, we are not bound by any legal interpretations made by the administrative agency or the trial court; rather, we make an independent review of any questions of law. (*Evans v. Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122]; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077 [55 Cal.Rptr.3d 14].)

## DISCUSSION

## I

■ The Board is entrusted with enforcing and administering the provisions of the Business and Professions Code governing psychologists. (§ 2920.) It "may suspend or revoke the registration or license of any registrant or licensee if the applicant, registrant, or licensee has been guilty of unprofessional conduct." (§ 2960.)

Rand contends the Board lacked jurisdiction to discipline him for his conduct as a special master because (a) he was acting in a judicial capacity and (b) he was not acting as a psychologist. We disagree.

## A

Rand contends the Board acted in excess of its jurisdiction when it disciplined him for conduct he believes he performed in a judicial capacity. He posits that a special master is the equivalent of a referee (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 8 [17 Cal.Rptr.2d 480]) and a referee is a subordinate judicial officer (Gov. Code, § 71601, subd. (i)). Thus his appointment as a special master meant he was acting as a subordinate judicial officer, not as a psychologist. In his view, he was subject to discipline by the Commission on Judicial Performance in accordance with California Constitution, article VI, section 18.1, which provides in relevant part: "The Commission on Judicial Performance shall exercise discretionary jurisdiction with regard to the oversight and discipline of subordinate judicial officers, according to the same standards, and subject to review upon petition to the Supreme Court . . . ." According to Rand, permitting the Board to discipline him would violate the separation of powers doctrine by infringing upon the powers of the judicial branch.

Rand relies on Government Code section 71601, subdivision (i), which provides: " 'Subordinate judicial officer' means an officer appointed to perform subordinate judicial duties as authorized by Section 22 of Article VI of the California Constitution, including, but not limited to, a court commissioner, probate commissioner, child support commissioner, referee, traffic referee, juvenile court referee, and juvenile hearing officer."[3] Government Code section 71622, subdivision (c), which is in the same chapter as Government Code section 70601, provides: "The Judicial Council shall promulgate rules establishing the minimum qualifications and training requirements for subordinate judicial officers." The Judicial Council did so in California Rules of Court, rule 10.701 (hereafter rule 10.701), which states that a " 'subordinate judicial officer' means a person appointed by a court to perform subordinate judicial duties as authorized by article VI, section 22 of the California Constitution, including a commissioner, a referee, and a hearing officer." (Rule 10.701(a).) Except for a person appointed as a juvenile referee or as a hearing officer under Welfare and Institutions Code section 255 or 5256.1, "a person is ineligible to be a subordinate judicial officer unless the person is a member of the State Bar . . . ." (Rule 10.701(b) & (d).)

The Board contends that Rand is not a subordinate judicial officer because he is not a member of the State Bar.

Rand responds that rule 10.701 does not apply to him because it is derived from former rule 6.660, which did not take effect until January 1, 2003, after Rand was appointed as a special master in October 2002.

As the appellant, Rand has the burden to support his arguments and factual assertions with references to the record. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245–1246 & fn. 14 [19 Cal.Rptr.3d 416].) He fails to support his claim that he was appointed as special master in October 2002. The parties' special master agreement, which was effective October 25, 2002, names Stephen Friedlander as special master. In January 2005, the trial court ordered that "Rand has been appointed by the court as a Special Master in this matter pursuant to the October 25, 2002 order." But this simply means that Rand was appointed pursuant to the order's provision that if Friedlander did not serve then the special master would be "another individual to be agreed upon by the attorneys for the parties." The order does not establish when Rand began serving as special master and Rand does not point to anything in the record establishing the date he replaced Friedlander. According to Ives's complaint with the Board, Rand did not begin serving as special master until July 2003, which was after former rule 6.660 (current rule

---

[3] Article VI, section 22 of the California Constitution provides: "The Legislature may provide for the appointment by trial courts of record of officers such as commissioners to perform subordinate judicial duties."

10.701) became effective. Accordingly, Rand has not provided the requisite factual support for his argument.

It is doubtful that Rand was a subordinate judicial officer subject to discipline by the Commission on Judicial Performance because he is not an attorney (rule 10.701); he was privately retained and paid, rather than an employee of the court system (rule 10.703(b));[4] and unlike attorneys, who are officers of the court system (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 592–593 [79 Cal.Rptr.2d 836, 967 P.2d 49]), Rand was not an "officer of the state judicial system." (Cal. Code Jud. Ethics, canon 6A.)[5] However, for purposes of this opinion we need not resolve whether Rand is a subordinate judicial officer. Rand fails to demonstrate that the Board does not have jurisdiction (concurrent or otherwise) to discipline a psychologist acting as a special master.

■ Attorneys acting as subordinate judicial officers are subject to discipline by both the State Bar and the Commission on Judicial Performance. Rule 1-710 of the Rules of Professional Conduct states: "A member who is serving as a temporary judge, referee, or court-appointed arbitrator, and is subject under the Code of Judicial Ethics to Canon 6D, shall comply with the terms of that canon."[6] The discussion following rule 1-710 of the Rules of Professional Conduct explains: "This rule is intended to permit the State Bar

---

[4] California Rules of Court, rule 10.703, which concerns the procedures for processing complaints against subordinate judicial officers in the trial court, states: "(b) . . . [¶] Unless the context requires otherwise, the following definitions apply to this rule: [¶] (1) 'Subordinate judicial officer' means an attorney employed by a court to serve as a commissioner or referee, whether the attorney is acting as a commissioner, referee, or temporary judge. The term does not include any other attorney acting as a temporary judge."

[5] Canon 6A of the California Code of Judicial Ethics provides in relevant part: "Anyone who is an *officer of the state judicial system* and who performs judicial functions, including, but not limited to, a subordinate judicial officer, magistrate, court-appointed arbitrator, judge of the State Bar Court, temporary judge, and special master, is a judge within the meaning of this Code." (Italics added.) In other words, the Code of Judicial Ethics does not apply unless one is an officer of the judicial system.

[6] Canon 6D of the California Code of Judicial Ethics, which pertains to temporary judges, referees, or court-appointed arbitrators, provides in relevant part: "A . . . person serving as a referee pursuant to Code of Civil Procedure section 638 or 639, . . . shall comply only with the following Code provisions: [¶] (1) A . . . referee . . . shall comply with Canons 1 [integrity and independence of the judiciary], 2A [promoting public confidence], 3B(3) [order and decorum] and (4) [patient, dignified, and courteous treatment], 3B(6) [require lawyers to refrain from manifestations of any form of bias or prejudice], . . . , when the . . . referee . . . is actually presiding in a proceeding or communicating with the parties, counsel, or court personnel while serving in the capacity of a . . . referee . . . in the case. [¶] (2) A . . . referee . . . shall, from the time of notice and acceptance of appointment until termination of the appointment: [¶] (a) Comply with Canons 2B(1) [not allow family or other relationships to influence judicial conduct], . . . 3B(5) [perform judicial duties without bias or prejudice], 3B(7)

to discipline members who violate applicable portions of the Code of Judicial Ethics while acting in a judicial capacity pursuant to an order or appointment by a court. . . ."

■ Rand proffers no reason why attorneys acting as special masters can be subject to discipline by their licensing authority (the State Bar), but psychologists acting as special masters cannot be subject to discipline by their licensing Board. He simply cites to inapposite cases concerning the discipline of judges, not subordinate judicial officers (*Kennick v. Commission on Judicial Performance* (1990) 50 Cal.3d 297 [267 Cal.Rptr. 293, 787 P.2d 591]; *Ryan v. Commission on Judicial Performance* (1988) 45 Cal.3d 518 [247 Cal.Rptr. 378, 754 P.2d 724]; *Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1]), and judges are not members of the State Bar (Cal. Const., art. VI, § 9). But absent a legislative enactment prohibiting the Board from exercising its authority over its licensees when they are acting as special masters or parenting coordinators, the Board has statutory authority under sections 2920 and 2960 to discipline its licensees for unprofessional conduct.

Indeed, Rand conceded as much in the trial court. He stated: "A Special Master may be subject to discipline by the Board . . . when the misdeeds relate to the licensee's competence or ability to engage in the practice of psychology, but not because his performance while acting as a court-appointed Special Master is deemed deficient by the Board. For, instance, if Dr. Rand while acting as a Special Master had committed a clear violation of a specific statutory provision within the disciplinary law . . . , the Board could have brought a disciplinary proceeding against him because his misconduct would have related to his competence to practice psychology."

■ Thus, Rand conceded the Board had jurisdiction to discipline him under certain circumstances even while he was acting as a special master. The trial court found those circumstances applied and, for the reasons that follow in parts IB and II, we agree with the trial court's determination that Rand was acting as a psychologist and engaged in unprofessional conduct in violation of section 2960. The Board did not discipline Rand for his substantive decisions as a special master, and it did not usurp the judicial function or violate the separation of powers doctrine.

---

[accord full right to be heard to those entitled; avoid ex parte communications, except as specified] . . ., 3C(1) [discharge administrative responsibilities without bias and with competence and cooperatively] . . . ."

## B

Rand maintains that the Board lacked the authority to discipline him because as a special master he was not acting as a psychologist within the meaning of the governing licensing laws.

Section 2903 states in relevant part: "The practice of psychology is defined as rendering or offering to render for a fee to individuals, groups, organizations or the public any psychological service involving the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior, such as the principles pertaining to learning, perception, motivation, emotions, and interpersonal relationships . . . . [¶] The application of these principles and methods includes, but is not restricted to: diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders of individuals and groups. . . ."

Accordingly, the practice of psychology encompasses rendering for a fee to individuals a psychological service involving the application of psychological principles of understanding and influencing behaviors, such as principles pertaining to motivation, emotions and interpersonal relationships. The trial court found that "the evidence shows that the nature of the task [Rand] was asked to perform as a special master fell squarely within the practice of the profession as defined by statute."

The stipulation and order under which Rand served as special master expressly stated that he was appointed based upon his "expertise . . . as a court-appointed expert and license[d] mental health professional." The stipulation provided that Rand was to make orders resolving conflicts between the parents on sensitive issues relating to child custody, such as sharing vacations and holidays; whether other people could participate in visitation; health care management; communication with the children during noncustodial time; modification of time sharing; and ordering a psychological evaluation if necessary. As the trial court observed, "In essence, . . . [Rand] was asked to manage interpersonal conflict . . . as much as possible, calm it when it occurred, and, in all ways possible, minimize the impact of such conflict, and of the divorce proceedings in general, on the children. Such a task surely involved the application of psychological principles, methods and procedures of understanding, predicting and influencing behavior, in particular, the application of principles pertaining to emotions and interpersonal relationships."

Moreover, Rand's psychological services were "render[ed] for a fee" (§ 2903) paid by the children's parents. The parties' agreement, which is incorporated in the trial court's order appointing a special master, permits the parties to file a complaint with the special master's licensing board. The

language of the agreement indicates that the parties and the trial court considered Rand to be acting as a psychologist. In addition, the Board's experts opined that Rand engaged in the practice of psychology while acting as a special master, and that he used his skills and training as a psychologist in providing special master services to Davis and Ives.

Rand disputes that he was engaged in the practice of psychology as a special master, arguing that "[t]he 'purposes' to which psychological principles and methods are applied cannot be different in kind from 'diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders [(§ 2903)],' and still constitute a psychological service." He believes that the services he performed were "different in kind."

■ Rand interprets both section 2903 and his function as a special master too narrowly. The statute states that the practice of psychology is rendering, for a fee, any psychological service involving the application of psychological principles and methods, and "[t]he application of these principles and methods includes, *but is not restricted to*: diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders of individuals and groups. . . ." (*Ibid.*, italics added.) Rand was hired to use psychological principles that involve understanding and influencing behaviors—such as principles pertaining to motivation, emotions and interpersonal relationships—in order to assist the parents in a contentious divorce to deal with visitation and parenting issues, thereby ameliorating any emotional and psychological problems suffered by the children as the result of their parents' inability to cooperate with each other. This is within the statutory definition of the practice of psychology.

Moreover, an article cited by Rand on the role of a parenting coordinator supports our determination. The article states that parenting coordination (which is the role undertaken by a special master) is a hybrid of psychotherapy, mediation, and child custody evaluation. (Kirkland & Sullivan, *Parenting Coordination (PC) Practice: A Survey of Experienced Professionals* (2008) 46 Fam. Ct. Rev. 622, 628.) In other words, the activities of a special master are a mixture of psychotherapy, mediation and forensic psychology.[7] It is the practice of psychology.[8]

---

[7] According to one of the Board's experts, "Forensic psychology is essentially the practice of psychology in the midst of some sort of legal proceeding or litigation," and "has to do with psychological evaluation and consultation primarily to courts and attorneys for legal proceedings." Rand's resume lists experience as a forensic psychologist.

[8] In February 2011, the American Psychological Association approved Guidelines for the Practice of Parenting Coordination as American Psychological Association policy. (<http://www.apa.org/practice/guidelines/parenting-coordination.pdf> [as of May 10, 2012].) Although the guidelines were not in effect at the time Rand committed the acts for which he

Rand also contends that he was not engaged in the practice of psychology because nonpsychologists such as attorneys may be appointed as special masters, which means the activities of a special master do not involve the practice of psychology.

First, it matters not whether nonpsychologists can act as special masters because the parties' special master agreement specifically sought the assistance of a licensed mental health professional. The parties considered the skills of a psychologist or similar mental health professional to be essential to navigate and address the interpersonal issues involved in their high-conflict dissolution. They wanted and hired a special master who would use his skills as a psychologist in performing his duties.

Second, that attorneys may be appointed as special masters does not mean that Rand was not practicing psychology as a special master. An attorney must also use skills similar to that of a psychologist in performing his or her function as a special master in difficult divorce cases. Although section 2903 prohibits the practice of psychology without a license "except as otherwise provided in this chapter," the attorney's conduct is permitted by section 2908, which provides in relevant part: "Nothing in this chapter shall be construed to prevent qualified members of other recognized professional groups licensed to practice in the State of California, such as, but not limited to, . . . attorneys admitted to the California State Bar, . . . from doing work of a psychological nature consistent with the laws governing their respective professions, provided they do not hold themselves out to the public [as a psychologist] or that they do not state or imply that they are licensed to practice psychology . . . ."

Rand interprets this statute as meaning that the Board cannot discipline a psychologist acting as a special master because the statute permits qualified members of other professional groups to do work of a psychological nature consistent with the laws governing their respective professions without being sanctioned by the Board. Rand misinterprets the statute as giving him immunity from discipline while acting as a special master.

Section 2908 is designed to enable nonpsychologists, under specified circumstances, to engage in activities that could be deemed the practice of psychology without being prosecuted for the unauthorized practice of the profession in violation of section 2903. It does not indemnify Rand from disciplinary action for misconduct while acting as a special master. This is so because (1) special masters are not a recognized professional group licensed

was disciplined, the fact the American Psychological Association believed it necessary to issue guidelines governing psychologists acting as parenting coordinators indicates that the activity is the practice of psychology.

to practice in California and (2) Rand is a psychologist and was hired as one, which means the Board may discipline him for his unprofessional conduct. (§ 2960.)

Rand has failed to meet his burden of establishing that the Board lacked jurisdiction to discipline him for his unprofessional conduct while acting as a special master.

## II

Rand also challenges the Board's disciplinary action on due process grounds. None of his contentions are persuasive.

## A

Rand argues he was denied due process because there were no statutes or guidelines giving him fair notice of the conduct to be avoided. He contends a disciplinary statute proscribing "unprofessional conduct" without standards to guide enforcement is unconstitutionally vague and there are no ascertainable standards guiding the Board's enforcement of the ethical conduct of special masters.

Section 2960 provides that "[u]nprofessional conduct shall include, but not be limited to" certain enumerated conduct, which means that other conduct may also be considered unprofessional. "[I]t is not necessary that [the governing statute] enumerate specific acts which constitute unprofessional conduct" (*Shea v. Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 575 [146 Cal.Rptr. 653]), but "unprofessional conduct" must relate to conduct which indicates an unfitness to practice the profession in question (*Cartwright v. Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 767 [129 Cal.Rptr. 462, 548 P.2d 1134]; *Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229 [82 Cal.Rptr. 175, 461 P.2d 375] (*Morrison*)).

Professionals are expected to have the ability to recognize conduct evincing unfitness to practice their profession. (*Shea v. Board of Medical Examiners, supra*, 81 Cal.App.3d at p. 575.) It "is that conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession." (*Ibid.*) "[S]tandards of due care and competence are commonly established by the generally accepted practices and procedures within the professional community." (*Milligan v. Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1006 [191 Cal.Rptr. 490], citing *Franz v. Board of Medical Quality Assurance, supra*, 31 Cal.3d at p. 138.)

Based on the provisions of the Business and Professions Code governing psychologists, the American Psychological Association (APA) ethical standards, and the APA guidelines for forensic psychologists, the Board's experts opined that Rand's conduct breached the standard of practice for psychologists and was unprofessional. Rand met with and talked freely with Davis and his attorney, but had minimal contact with Ives and refused to communicate with her attorney. He also hired Davis's attorney to file a lawsuit against Ives. This was an extreme departure from the standard of practice, which required Rand to remain neutral and unbiased. He was hired to assist the parents in resolving their conflicts but he behaved in a way that created an appearance of bias. Dr. Fridhandler, one of the Board's experts, explained that when a parent feels there is unfairness or bias, the parent is less likely to accept a decision or to deescalate the situation for the benefit of the children. Furthermore, Rand violated the standard of care when he failed to reconsider and rectify the imbalance in communication he had created.

Wrongly accusing Ives of perjury and refusing to speak to her was not dignified, courteous or professional. Refusing to speak to Ives's lawyer indicated a bias against him or would lead a reasonable person to believe that Rand harbored such a bias. Rand's disparate treatment of Davis and Ives (for example, readily conversing with one while refusing to speak to the other) would lead a reasonable person to doubt Rand's impartiality. Because he was aware of or should have been aware of the applicable rules, standards and guidelines for impartiality, Rand received sufficient notice that it was unprofessional to conduct himself in a manner that created an appearance of bias, and the rules, standards and guidelines were not unconstitutionally vague as applied to him. The parties sought to use Rand, a mental health professional, as a special master because they wanted him to employ his skills and training as a psychologist to decrease their conflict, not to foment it by engaging in discourteous and disparate treatment of the parties.

Rand insists he cannot be sanctioned for unprofessional conduct under section 2960 because he did not violate any APA standards governing psychologists. He maintains that section 2936 requires the Board to use APA ethical standards in any disciplinary action, but none govern the conduct of a psychologist acting as a special master.

Section 2936 states in relevant part: "The board shall adopt a program of consumer and professional education in matters relevant to the ethical practice of psychology. The board shall establish as its standards of ethical conduct relating to the practice of psychology, the 'Ethical Principles and Code of Conduct' published by the American Psychological Association (APA). Those standards shall be applied by the board as the accepted standard of care in all licensing examination development and in all board enforcement policies and disciplinary case evaluations."

■ That the Board must use the APA ethical standards does not mean they are the sole applicable standards, only that the Board may not use ethical regulations that conflict with the APA standards. Our interpretation is supported by the introduction to the APA's Ethical Principles of Psychologists and Code of Conduct, which states, "If this Ethics Code establishes a higher standard of conduct than is required by law, psychologists must meet the higher ethical standard." Moreover, the APA does not consider its standards to be comprehensive, as is evidenced by its introductory statement to its ethical standards: "The fact that a given conduct is not specifically addressed by an Ethical Standard does not mean that it is necessarily either ethical or unethical."

In any event, Dr. Fridhandler testified that APA Ethical Standards 3.05 and 3.06, concerning multiple relationships and conflicts of interest, provided some guidance to Rand regarding a psychologist's need for impartiality.

APA Ethical Standard 3.05 provides in part: "(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person . . . . [¶] A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists. . . ."

APA Ethical Standard 3.06 concerning conflicts of interest states: "Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence or effectiveness in performing their functions as psychologists . . . ."

These standards, even if not directly applicable, gave Rand notice of the importance of objectivity in his professional conduct. Readily communicating with Davis but refusing to communicate with Ives and suing her using Davis's attorney, indicated that Rand was aligning himself with Davis, which had the potential to impair Rand's objectivity.

Furthermore, Rand overlooks that other ethical standards informed him of the importance of unbiased, objective behavior. Because his function as a special master included aspects of forensic psychology, Rand received guidance concerning what was considered professional conduct from APA Ethical Standard 2.01(f), which states: "When assuming forensic roles, psychologists are or become reasonably familiar with the judicial or administrative rules governing their roles." Either Rand did not familiarize himself with the

judicial rules mandating the appearance of impartiality, or he ignored them. Indeed, he did so even though the special master agreement, which was incorporated into the order appointing Rand, drew them to his attention by stating that he could be disqualified on any grounds applicable to the removal of a judge, arbitrator or referee. Code of Civil Procedure section 170.1, subdivision (a) provides a judge shall be disqualified if "(6)(A) For any reason: [¶] . . . [¶] (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. [¶] (B) Bias or prejudice toward a lawyer in the proceeding may be grounds for disqualification."

In addition, canon 2 of the California Code of Judicial Ethics directs that a judge shall avoid the appearance of impropriety. According to canon 3B(4) "A judge shall be patient, dignified, and courteous to litigants . . . ." Canon 3B(5) states: "A judge shall perform judicial duties without bias or prejudice," and "shall not, in the performance of judicial duties, engage in speech, gestures, or other conduct that would reasonably be perceived as (1) bias or prejudice . . . ."

Rand also received guidance from APA Ethical Standard 2.01(e), which states: "In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect clients/patients, . . . and others from harm."

Thus, although there were not yet APA standards created expressly for special masters or parenting coordinators (see fn. 8, *ante*), there were nonetheless APA standards governing Rand's conduct. Rand knew or should have known that he had an obligation to behave in a way that would alleviate conflict and would help Ives and Davis to do what was in the best interests of their children by reducing any potential psychological harm to them. Disparate treatment of the children's mother was unlikely to achieve this goal, and would make an objective observer question Rand's impartiality. Refusing to talk with Ives's attorney, Mr. Dougherty, after he had substituted in for all purposes in the dissolution action was not helpful in resolving conflicts and promoting the best interests of the children. Rand's behavior was unprofessional.

Rand believes his conduct was warranted and justifiable because of Ives's difficult behavior. As the trial court observed, however, "[t]he adversarial nature of [Rand's] relationship with Ms. Ives is clear from the record, but [Rand's] argument that it justified disparate treatment of the parties neglects his role in creating that adversarial relationship and allowing it to continue." Rand was hired because of the high-conflict situation created by one or both parents. He was supposed to use his professional expertise to minimize the

conflict, not become embroiled in it himself. Once he developed a personal problem with Ives and lost his professional distance, he should have been guided by APA Ethical Standard 2.06(b), which states: "When psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance and determine whether they should limit, suspend or terminate their work-related duties." Rand did not. Instead he opted to treat Ives in a disparate manner that created an appearance of bias. This appearance intensified when Rand employed Davis's attorney to collect his special master fees from Ives.

Rand disagrees that it was inappropriate to use Davis's attorney to collect a debt from Ives while he was still acting as a special master and resolving conflicts between Ives and Davis over parenting issues. He states, "The idea that there might be a 'psychologically appropriate' way of collecting a debt strains credulity. . . . Apparently, the Board has concluded that when a psychologist attempts to collect a debt, he or she must do so in a manner that causes the client-debtor to 'feel good' about the process. . . . There is nothing in the APA Ethics Code which suggests that [he] had to find a way to collect a debt from Ives in a way that would have been emotionally neutral or emotionally satisfying for her."

This is a mischaracterization of the Board's reason for disciplining Rand. It did not care if Ives felt good about the debt collection process, only that Rand not act in a manner that gave the impression he was biased in favor of her husband while acting as their special master. Rand's response indicates he still does not understand that it is unprofessional for a psychologist acting as a special master to conduct himself in a way that calls into question his impartiality. This is so despite the fact that all of the aforementioned standards informed Rand of what the APA and the Board considered professional conduct, and provided him with the requisite notice of the parameters of unprofessional conduct. Rand's claim to the contrary fails.

## B

Rand also contends he was denied due process because the Board's findings did not satisfy the "logical nexus" rule. As we have explained, "unprofessional conduct" must relate to conduct which indicates an unfitness to practice one's profession. (*Cartwright v. Board of Chiropractic Examiners, supra,* 16 Cal.3d at p. 767; *Morrison, supra,* 1 Cal.3d at p. 229.) Rand argues there is no logical nexus between the Board's findings of unprofessional conduct and the requisite unfitness to practice his profession.

But Rand does not discuss all of the unprofessional conduct for which he was disciplined, and he does not show how such conduct fails to demonstrate

an unfitness to practice psychology. For example, with respect to the special master case, Rand merely asserts there must be "a logical nexus between [his] conduct as a subordinate judicial officer and his ability to practice psychology," and the Board failed to show that the appearance of bias demonstrated an unfitness to practice psychology. Thus, in Rand's view, the Board only demonstrated his unfitness to practice as a *psychologist acting as a special master*, and not as a psychologist in general.[9]

Rand did not raise this contention at either the administrative hearing or in the trial court. He only disputed that he was acting as a psychologist while he was a special master, an argument we address and reject earlier in this opinion. It is a general rule that contentions not raised in the trial court will not be considered on appeal. (*Franz v. Board of Medical Quality Assurance, supra,* 31 Cal.3d at p. 143; *Shea v. Board of Medical Examiners, supra,* 81 Cal.App.3d at p. 576.) The rule "is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468 [33 Cal.Rptr.2d 217].) Accordingly, we could deem the issue forfeited.

In any event, Rand's contention is too simplistic. There are numerous ways to practice the profession of psychology such as psychotherapy, educational testing, forensic psychology and, as in this case, being a special master in high-conflict divorces to assure that the best interests of the children are protected. Rand points to no authority for the proposition that if he engages in unprofessional conduct in one task—which he did as a special master—his license cannot be suspended unless the Board demonstrates he is unfit to

---

[9] In response to Rand's assertion that there is no logical nexus between his conduct and his unfitness to practice his profession, the Board presents an extensive substantial evidence argument demonstrating that the evidence supports each of the accusations and findings of negligence and unprofessional conduct. But Rand did not present a cognizable challenge to the sufficiency of the evidence under a descriptive argument heading, setting forth all of the evidence rather than only the evidence in his favor, and showing how the evidence was insufficient even when all reasonable inferences were indulged in favor of the judgment. As such, he has forfeited a challenge to the sufficiency of the evidence to support the findings. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362] [in a challenge to the sufficiency of the evidence the appellant's brief must set forth all of the material evidence bearing on the issue, not merely the evidence favorable to the appellant, and also must show how the evidence does not sustain the challenged finding]; *Nwosu v. Uba, supra,* 122 Cal.App.4th at pp. 1245–1246 & fn. 14 [the failure to present argument with references to the record and citation to legal authority results in a forfeiture of any assertion that could have been raised]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263] [the appellant must present each point separately in the opening brief under an appropriate heading, showing the nature of the question to be presented and the point to be made or it is forfeited]; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432] [appellants may not attempt to rectify their oversights for the first time in their reply briefs].)

practice other types of psychology practice. Nor does he present a reasoned argument in support of such a claim. (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672–673, fn. 3 [33 Cal.Rptr.2d 13] [in a challenge to a judgment, it is incumbent upon the appellant to present factual analysis and legal authority on each point made].)

Unlike *Morrison, supra*, 1 Cal.3d 214, on which Rand relies, Rand did not engage in personal, private conduct that was not shown to have any bearing on his fitness to practice his profession. (*Id.* at pp. 218–219, 229.) Rather, he engaged in unprofessional conduct in the practice of psychology. The requisite logical nexus was established.

With respect to the Florida child custody case, Rand maintains he did not violate APA Ethical Standard 9.01, and even if he did, the Board failed to establish that his conduct showed he was unfit to practice as a psychologist.

APA Ethical Standard 9.01 (hereafter 9.01) provides in relevant part: "(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions and appropriately limit the nature and extent of their conclusions or recommendations. . . . [¶] (c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations."

Rand contends the exception in 9.01(c) applies because the Florida judge understood Rand had not interviewed the child and that his opinion was based on a record review. But 9.01(c) requires a psychologist to "explain" why an individual examination is not warranted or necessary for the opinion. Rand "did not explain to the court the probable impact on the reliability and validity of his opinions of his not having personally interviewed or evaluated the child." Thus, if an examination was warranted, Rand violated 9.01(b), because he opined that the child suffered from parental alienation syndrome without interviewing the child, without making reasonable efforts to interview the child, without clarifying the probable impact of the limited information on the reliability and validity of his opinion, and without appropriately limiting the nature and extent of his conclusions when the court asked Rand if the child suffered from the syndrome and if custody should be changed to the noncustodial parent. Moreover, if an examination was not warranted, Rand nonetheless violated 9.01(c) by not providing sufficient explanation.

Relying on *In re Kelly* (2009) 158 N.H. 484 [969 A.2d 443], Rand disagrees that he violated 9.01(b). But Rand's reliance on *In re Kelly* is misplaced. In that case, a divorced father sought overnight visitation with his minor daughter. The trial court ordered him to complete a psychological evaluation and to present expert testimony at a hearing establishing that he had dealt with his anger and parenting issues as they related to his daughter. The father retained Dr. Kelly, who performed a full psychological evaluation of the father and had several therapy sessions with him. (*In re Kelly, supra,* 969 A.2d at p. 444.) Dr. Kelly testified at the visitation hearing and recommended an increase in visitation, noting that both father and daughter would grow from the interaction. (*Id.* at p. 445.)

The mother filed a complaint against Dr. Kelly with the Board of Mental Health Practice over his recommendation that visitation be increased and his suggestion that the daughter would grow from the experience, given that Dr. Kelly never examined the child. The board found that Dr. Kelly violated 9.01(b), but the Supreme Court of New Hampshire reversed this decision. (*In re Kelly, supra,* 969 A.2d at pp. 447–448, 450.) The court stated, "This Standard applies only if Dr. Kelly provided an opinion of a psychological characteristic of an individual other than [the father]. *See APA Code of Conduct,* Standard 9.01(b). The board's own report of its initial investigation of the complaint as well as several of the Board's findings stated that his opinions were limited to [the father], and that references to the child were intended in the global sense that children benefit from having an involved father. Assuming, without deciding, that the Board could reasonably have found that the recommendation to '[i]ncrease visitation with daughter,' and the statement that 'both would grow from the interaction,' did in fact provide an opinion as to the daughter, the Board's ruling failed to address how this recommendation constituted an opinion of a psychological characteristic of the daughter such that an examination of the daughter would be required pursuant to the *APA Code of Conduct.*" (*Id.* at p. 450.)

In contrast, Rand gave an opinion of the psychological characteristics of the child in Florida; he opined the child suffered from parental alienation syndrome. Rand did not inform the judge that the value of his opinion was limited because he had not interviewed the child. Rand violated 9.01(b).

Rand argues that even if he did violate 9.01(b), the Board failed to show that his conduct established he was unfit to practice as a psychologist because it failed to show that his conduct threatened the health, safety and welfare of consumers of psychological services. He hints this is so because the Florida court ultimately did not change custody and did not refer the child to Rand's parental alienation program.

■ However, Rand's failure to comply with an ethical standard governing his profession threatens the welfare of consumers of psychological services even if no harm has yet occurred. "[T]he potential for such impact provide[s] the necessary nexus." (*Watson v. Superior Court* (2009) 176 Cal.App.4th 1407, 1415 [98 Cal.Rptr.3d 715].) The Board need not wait until harm occurs. (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 772 [117 Cal.Rptr.2d 445].)

In addition, Rand overlooks that his unfitness to practice is based on more than this single finding. Among other things, the Board and the trial court also found that Rand was dishonest with the Board when it investigated Rand's conduct in the Florida case. And in the special master case, Rand planned on deceiving Davis regarding the reasons for his negotiated withdrawal.

■ " '[T]here is more to being a licensed professional than mere knowledge and ability. Honesty and integrity are deeply and daily involved in various aspects of the practice.' [Citation.]" (*Griffiths v. Superior Court, supra,* 96 Cal.App.4th at p. 772.) A professional who has shown dishonesty has demonstrated professional unfitness meriting license discipline. (*Id.* at pp. 771–772.)

Rand has failed to meet his appellate burden of demonstrating that there is no logical nexus between his unprofessional conduct and his fitness to practice the profession.

### III

Rand further contends that, as a matter of law, the Board's factual finding that he attempted to minimize his role in the Florida child custody case does not support its legal conclusion that he was dishonest. In his view, the fact he minimized his role is not the equivalent of dishonesty, which Rand contends requires a willful perversion of the truth in order to deceive, cheat or defraud. Rand maintains that the trial court could not go beyond the Board's factual findings and make new ones to support the Board's legal determination that he was dishonest, because only the Board could make factual findings. In his reply brief, Rand asserts that the Board misunderstands his appellate argument and claims he is not challenging the sufficiency of the evidence to support the factual findings, only whether the findings support the judgment.

In the trial court, however, Rand asserted that the evidence did not support the finding that Rand intended to mislead the Board. He did not contend that the Board's factual findings did not support its legal conclusion that he was dishonest. "It is well established that a party may not raise new issues on appeal not presented to the trial court. [Citation.]" (*A Local & Regional*

*Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804 [16 Cal.Rptr.2d 358]; accord, *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1351 [19 Cal.Rptr.3d 445].)

Furthermore, when, as here, the superior court exercises its independent judgment, it does so "in a limited trial de novo." (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 143.) It resolves evidentiary conflicts, assesses the witnesses' credibility, and arrives at its own independent findings of fact. (*Deegan v. City of Mountain View, supra,* 72 Cal.App.4th at p. 45.) Because of the importance of rights affected by administrative adjudications subject to the independent judgment test of review, " '. . . California fixes responsibility for factual determination at the trial court rather than the administrative agency tier of the pyramid as a matter of public policy.' [Citations.]" (*Barber v. Long Beach Civil Service Com., supra,* 45 Cal.App.4th at p. 659.)

Thus, we review the trial court's factual findings, not those of the administrative agency, and determine whether they are supported by substantial evidence. (*Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 824.) The evidence, including all reasonable inferences derived therefrom (*Barber v. Long Beach Civil Service Com., supra,* 45 Cal.App.4th at p. 659), supports the trial court's determination that Rand dishonestly minimized his role in the Florida case in response to the Board's investigation.

The Board sent Rand a letter advising him it had received a complaint regarding his conduct in the Florida case. The Board summarized the allegations against Rand, stating he had participated in the child custody case as an expert on parental alienation syndrome; he made recommendations to the court regarding custody, despite the fact he was not the court-appointed evaluator and had never spoken to the father or the minor child; and he reviewed privileged records without a release from the parents or permission from the judge. The Board asked Rand to respond to the allegations by a specific date.

Rand responded that the allegations were false and stated, "I was not called upon to conduct interviews, make diagnoses, render opinions or make recommendations about child custody in this case. I had a very peripheral involvement in this family law matter." According to Rand, the court called him for the sole purpose of inquiring about generic information pertaining to Rand's program for reuniting abducted and severely alienated children. The only document he reviewed was the court-appointed evaluation report without any of the exhibits. Rand stated he made it clear to the court that he was not making a custody recommendation and was only providing generic information.

Rand failed to disclose to the Board that he was poised to conduct a parental alienation intervention if one was approved by the Florida court, which belied his claim of only a peripheral involvement. In addition, he did not fully and honestly disclose the tenor and substance of the Florida court's questions and his answers. The Florida judge asked Rand concrete questions seeking confirmation of Dr. Evans's opinion about the child who was at the center of the custody hearing, and asked if it was Rand's conclusion that it was in the child's best interest for custody to be changed to the mother, and for the child to go through Rand's parental reunification process. Rand expressly opined, under oath, that the child suffered from parental alienation syndrome and that a change of custody from the father to the mother was warranted. Rand did not explain that his opinion had limited value because he had not interviewed the child or his father and his opinion was based on the evaluations conducted by others. And although he initially told the Florida judge that he could not make a custody recommendation, he ultimately did just that. Rand neglected to mention this to the Board and deceptively downplayed his role, as well as the fact he had a financial interest in a change of custody and a referral to his program.

Rand misrepresented the importance of his activities and the level of his involvement. As the Board's expert, Dr. Shields, observed, the Florida court's custody questions were not merely hypothetical; the court sought Rand's expert opinion on the pending custody determination and the proffering of such an opinion "is the most central role a psychologist can play in a child custody matter." Furthermore, Rand's conduct in making a custody recommendation without having directly interviewed and evaluated the parties was unethical and unprofessional.

When the Board investigated Rand's inappropriate conduct, Rand attempted to mislead the Board by indicating he had been nothing more than a helpful independent consultant providing generic information to the court. But a psychologist who is called into litigation for his or her expertise has a central, not a peripheral, role and this is particularly true when the psychologist makes a custody recommendation. Such a misrepresentation in response to the licensing Board's investigation of a complaint against Rand's conduct as a forensic psychologist is substantially related to the practice of psychology, and supports the trial court's determination Rand was dishonest.

Rand challenges the finding that he dishonestly minimized his involvement, but views the evidence in the light most favorable to himself—for example, claiming he simply forgot that he made a custody recommendation and did not intend to mislead the Board—rather than demonstrating how the evidence is insufficient when viewed in the light most favorable to the trial court's findings. In effect, he asks us to make credibility determinations and

reweigh the evidence, which we are not authorized to do. (*Barber v. Long Beach Civil Service Com., supra,* 45 Cal.App.4th at p. 659.) Under the circumstances, his challenge to the finding of dishonesty fails.[10]

## DISPOSITION

The judgment is affirmed.

Blease, P. J., and Hull, J., concurred.

A petition for a rehearing was denied June 11, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 15, 2012, S203439.

---

[10] The Association of Certified Family Law Specialists (the Association) filed an amicus curiae brief, stating that its purpose in appearing is "to protect and perfect the parenting coordination service model in California family courts, [to] discuss the implications of the issues raised in this case for the future of parent coordination in California, and address the implications of those issues for other family court appointed neutrals including but not limited to child custody evaluators, minors' counsel appointed per Fam[ily] Code [section] 3150 et seq., mediators, therapists, members of collaborative family law teams, and other court appointed or connected quasi-judicial dispute resolution professionals." It discusses the difficulties created by the absence of legislation governing parenting coordination despite the increasing use of special masters to assist family courts; contends that parenting coordination programs must be structured to protect parenting coordinators from being "triangulated into the family conflict"; and suggests that grievance procedures should be concentrated in the appointing court and that licensing agencies should defer to the appointing court's findings. The Association's suggestion that specific legislation governing special masters is needed should be directed to the Legislature, not this forum. And to the extent the Association's brief raises arguments that were not presented in Rand's appeal or tendered in the trial court, we decline to address them. (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274–1275 [36 Cal.Rptr.2d 404] [amicus curiae must accept the issues urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered].)