Filed 12/17/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WILLIAM MICHAEL CLAWSON,<br>　　Plaintiff and Appellant,<br>v.<br>BOARD OF REGISTERED NURSING,<br>　　Defendant and Respondent. | A159990<br><br>(City & County of San Francisco<br>Super. Ct. No. CPF19516578) |

Plaintiff appeals from the denial of his petition for writ of administrative mandate following the revocation of his nursing license by the Board of Registered Nursing (Board) for gross negligence and unprofessional conduct in carrying out licensed nursing functions and unprofessional conduct–deceit. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.　*Board Hearing***

Nina's Care Home (Nina's) was a residential care facility for the elderly (RCFE) licensed by the Community Care Licensing Division (CCL) of the State Department of Social Services. Following the unexpected death of the Nina's administrator, an attorney for the administrator's estate, Lisa Russ, hired plaintiff to assist with the closure of Nina's. Plaintiff, who was a registered nurse and a certified legal nurse consultant, agreed to assess each of the residents and recommend a new facility for them, as required by the

1

RCFE closing procedures. The purpose of the assessments was to help the residents choose an appropriate facility based upon their needs.[1]

On May 11, 2013, plaintiff and Mia B.[2] performed the assessment for J.N., an 83-year-old resident of Nina's. Mia B. lifted up J.N.'s clothing so that the plaintiff could see her skin condition. Plaintiff testified the assessment was "very quick. We were in there for maybe two minutes." Plaintiff found that J.N.'s skin on her coccyx and on each of her heels was red and nonblanching to the touch, which he believed was significant.[3] He did not touch the bandages covering J.N.'s feet. Nor did he notice that one of J.N.'s knees was significantly contracted.

Plaintiff signed the resident appraisal form using his "RN" initials and described J.N.'s overall health condition as: "Frail and cachextic [*sic*] female

---

[1] Health and Safety Code section 1569.682, subdivision (a)(1)(A) requires that prior to transferring a resident to another facility an RCFE must "[p]repare . . . a relocation evaluation of the needs of that resident, which shall include: [¶] . . . [r]ecommendations on the type of facility that would meet the needs of the resident based on the current service plan." Health and Safety Code section 1569.70 provides guidelines for the varying levels of care provided by an RCFE, and section 1569.72, subdivision (a) states, with a limited exception for some temporary illnesses, "no resident shall be admitted or retained in a residential care facility for the elderly if . . . : [¶] . . . [t]he resident requires 24-hour, skilled nursing or intermediate care [or] [¶] . . . is bedridden . . . ."

[2] Mia B. had worked at Nina's as a care worker for 24 years. She did not have any nursing credentials. When the administrator of Nina's died, Mia B. became the interim administrator. She did not wish to be the interim administrator and did not understand why she became the interim administrator. Mia B.'s English was limited, such that she was not comfortable completing paperwork.

[3] An expert witness for the Board testified, "By definition, a non-blanchable area . . . already demonstrates a skin compromise . . . and that is a stage one [pressure ulcer]."

with severe cognitive impairment, poor appetite, chronic nausea and diarrhea, and weight loss. Soft diet tolerated fair. Skin is friable with redness to bony prominences. Scratches self severely with fingernails." Plaintiff also signed a "Needs and Services Plan" in which he described J.N. as: "Frail, pleasant elderly female with severe cognitive impairment, cachexia, and fragile skin. Disoriented, alert, unable to respond appropriately. Unable to walk, but can stand briefly with assistance. Unable to self-transfer from bed to chair or wheel chair. Minimally able to reposition self in chair or bed. Longstanding history of alcohol abuse per medical record. Easily agitated and becomes very anxious, requiring medication. Conservator is Public Guardian, Kelly Schwartz. Significant medical history includes rheumatoid arthritis, depression, low thyroid, urinary incontinence with chronic and severe urinary tract infections (requiring hospitalization), anorexia with significant weight loss, Alzheimer's dementia, diarrhea, and poor nutrition and fluid intake with hospitalization for dehydration. Long standing history of self-injury from fingernail scratching to face and body per care providers. Overall skin condition is fragile with compromised skin integrity to groin, significant redness to bony prominences including coccyx, heels, toes. Foot dressings cover toes." (All caps omitted.) On both forms, plaintiff's signature certified that "to the best of [his] knowledge [J.N.] does not need skilled nursing care." (All caps omitted.)

On May 23, 2013, the caregivers from the new RCFE, Frye's Care Home, came to transfer J.N. They immediately noticed that J.N. was in significant pain. Every time they moved J.N. she cried out in pain. When they arrived at Frye's, the caregivers tried to give J.N. a shower and body check. They discovered multiple bandages on her arm, knee and toes. The bandages "were stuck to [J.N.'s] skin and her wounds," and they were not

3

freshly placed. The wounds "all smelled really bad." The sore on the back of J.N.'s knee was very large, and her tendons were visible. J.N.'s toes were black, and she had "a very strong infection odor." One witness described J.N.'s condition as "very horrifying." The Frye's caregivers called 911 and went to the hospital with J.N. J.N. died several weeks later.

On May 31, 2013, a CCL investigator contacted plaintiff. Plaintiff identified himself to the CCL investigator as a registered nurse specializing in elder care in CCL-licensed facilities and explained that he had been hired by the estate and the estate's attorney. A few months later, the CCL investigator conducted a recorded interview with plaintiff. Plaintiff stated he had performed J.N.'s assessment and described how he had directed Mia B. to perform tasks at his direction. He stated he performed a "head-to-toe" assessment by having Mia B. lift J.N.'s clothing so that plaintiff could see areas of "bony prominences . . . ." He asked Mia B. to touch J.N.'s skin where it was very red so he could see how quickly the "capillary refill" occurred. He recalled looking at J.N.'s coccyx and stated there was no wound there.

Plaintiff told the investigator that J.N.'s feet were covered in dressings, which he did not remove to look at her skin. He understood from Mia B. that the dressings had been placed there by J.N.'s podiatrist. He did not know what the wound care plan was and did not see any documentation in J.N.'s records regarding the treatment plan for J.N.'s feet. Plaintiff stated that there was no malodor of J.N. during the assessment or when he was at the facility on May 23 when J.N. was transferred to Frye's. He stated that he "would have been assessing if there were any odors of feces or urine or bacterial infection as a registered nurse, that's what we do, and [his] assessment skills are fine." In the May 2013 time frame, plaintiff further

4

confirmed to others orally and in writing that he had performed J.N.'s assessment.

About 14 months after the incident, the Board interviewed plaintiff as part of its investigation. At that time, plaintiff denied performing J.N.'s physical assessment, stating that Mia B. "was the one in charge." He told the investigator that Mia B. "decided what body part would be looked at and whether or not the clothing was moved, and if any of the gauze or bandages on the residents would be moved to expose anything." He further denied even guiding or instructing Mia B. during the assessment. Plaintiff told the investigator that he was not acting as a registered nurse at the time of J.N.'s assessment. At the administrative hearing, plaintiff testified that he acted as a "scribe" by filling out the resident appraisal form based on the information Mia B. provided as she performed the assessment.

## II.   *Board Decision*

Following the eight-day administrative hearing, and submission of briefs by the parties, the administrative law judge (ALJ) issued a proposed decision. The ALJ found clear and convincing evidence that plaintiff committed gross negligence in connection with the appraisal of J.N., unprofessional conduct in carrying out nursing functions in connection with the appraisal of J.N., and unprofessional conduct by not being truthful with the Board investigator regarding the care provided to J.N. The ALJ summarized his conclusions as follows: "[Plaintiff] had the express responsibility to perform resident appraisals and to make recommendations regarding the level of care each resident required, and by directly observing and assessing J.N., [plaintiff] was in the best position to identify and thoroughly document her serious condition.

5

"Even as [plaintiff] described J.N. as 'emaciated,' he neglected or overlooked the most important point in the Resident Appraisal and Needs and Services Plan: J.N. was far too sick to reside in an RCFE without the addition of . . . skilled nursing services, and he neither documented the specifics of her skin condition, nor her inability to reposition herself in bed, or her inability to independently take medication. Any of these issues required an enhanced level of care that is not provided by an RCFE, without special home health or other specialized services. [Plaintiff] did not identify the need for these services to be available following J.N.'s transfer, nor did he contact her physician to request that they be ordered. As a nurse he was require [*sic*] to do so. (Health & Saf. Code, § 1569.72, subd. (b)(1); Cal. Code Regs., tit. 16, § 1443.5.)

"In the subsequent investigation of J.N.'s care, [plaintiff] first described one set of facts, but a year later when speaking to a different investigator, he characterized the critical few minutes he spent doing the assessment in much different terms. In the second retelling, he placed [Mia B.] in charge, while in the former, he acknowledged conducting the appraisal. The Resident Appraisal he prepared clearly reflected his thoughts and conclusions, not those of someone speaking limited English and without medical training. This second characterization was untruthful."

The Board adopted the ALJ's proposed decision and revoked plaintiff's nursing license.

III. *Petition for Writ of Administrative Mandate*

Plaintiff challenged the Board's decision in a petition for writ of administrative mandate. He argued that the Board's decision should be reversed because: (1) the performance of the RCFE appraisal was not a "nursing function"; (2) the Board failed to plead that plaintiff violated any

6

RCFE statutes or regulations, and the Board has no power to discipline plaintiff for any such violations; (3) plaintiff had no obligation to render nursing services to J.N. because no nurse–patient relationship existed between them; and (4) Business and Professions Code section 2761[4] does not authorize disciplining plaintiff for dishonesty during the investigation. On October 16, 2019, the trial court issued an order rejecting each of plaintiff's arguments and denying the petition. Judgment was entered on January 8, 2020.

## DISCUSSION

On appeal, plaintiff raises the same issues he argued in the trial court. We review questions of law de novo, and we review the trial court's factual findings under the substantial evidence standard, resolving all conflicts in evidence and indulging all reasonable inferences in favor of the trial court's judgment. (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 574–575 (*Rand*).) We find no errors of law and that substantial evidence supports the judgment. Accordingly, we affirm.

### I. *Substantial evidence supports the finding that plaintiff engaged in a "usual nursing function" when he performed J.N.'s resident appraisal.*

Plaintiff argues that he cannot be disciplined for negligently performing J.N.'s appraisal because doing so was not a "nursing function." He contends that because the RCFE statutes and regulations do not require facility licensees to hold nursing licenses (Health & Saf. Code, § 1569.15), and because they state that either the "facility" or the "licensee" must prepare resident appraisals (Cal. Code Regs., tit. 22, §§ 87456, subd. (a), 87457, subd. (c), 87463, subd. (a); Health & Saf. Code, § 1569.682, subd. (a)(1)), it

---

[4] All statutory references are to the Business and Professions Code unless otherwise stated.

7

necessarily follows that performing resident appraisals is not a nursing function. According to plaintiff, if resident appraisals constitute a nursing function, then the RCFE regulations permit non-nurse licensees to practice nursing without a license.

We disagree. First, simply because a resident appraisal may be performed by a person who is not a licensed nurse does not mean that when a nurse undertakes the task, using his or her scientific knowledge and technical skills, he or she must not be performing a nursing function. Under section 2761, subdivision (a)(1), a nurse may be disciplined for unprofessional conduct constituting "gross negligence in carrying out usual certified or licensed nursing functions." Further, as the trial court explained, section 2725, subdivision (a)(4) specifies that nursing functions include " '[o]bservation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and . . . determination of whether the signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics,' as well as 'implementation, based on observed abnormalities, of appropriate reporting, or referral . . . .' "

Substantial evidence supports the finding of the ALJ and the trial court that when plaintiff conducted his appraisal of J.N. he was performing a nursing function. Plaintiff signed both the appraisal and the needs and services plan using his "RN" designation. He described J.N. using scientific or technical terms such as "cachectic," which the Board's decision explains refers to "general physical wasting and malnutrition usually associated with chronic disease." He told the CCL investigator that part of his assessment of J.N. included "assessing if there were any odors of feces or urine or bacterial infection as a registered nurse, that's what we do, and my assessment skills are fine." He also testified that he agreed with his own expert "that

8

performing a resident appraisal, the function is clinical nursing." Plaintiff's expert, who was a registered nurse and worked as a legal nurse consultant, testified that she does not perform resident appraisals when she acts as a legal nurse consultant because doing so constitutes patient care.[5] Additionally, two registered nursing experts with experience as RCFE administrators testified on behalf of the Board that RCFE resident appraisals involve usual nursing functions.

*Rand, supra*, 206 Cal.App.4th 565, addressed an analogous situation in which a licensed psychologist was disciplined for conduct while acting as a court-appointed special master in a divorce proceeding and while acting as an expert witness in another family law matter. (*Id.* at pp. 569–572.) The court rejected Rand's argument that he could not be disciplined by the Board of Psychology for conduct he believed he performed in his judicial capacity. (*Id.* at pp. 579–580.) It found that the evidence, including the parties' agreement, supported the finding that the tasks Rand was asked to perform, including managing interpersonal conflict and minimizing the impact of such conflict on the children, involved the application of psychological principles. (*Ibid.*) Further, the Board's experts opined that Rand engaged in the practice of psychology while acting as a special master. (*Id.* at p. 580.) The court rejected Rand's argument that because nonpsychologists may be appointed special masters, the activities of special masters do not involve the practice of psychology. (*Id.* at p. 581.)

Here, too, the evidence supports the trial court's finding that in performing the appraisal, plaintiff observed J.N. for symptoms of illness and

---

[5] Plaintiff's expert opined that in this case Mia B. performed the appraisal and that plaintiff only transcribed what she told him. But she acknowledged that if, in fact, plaintiff had performed the appraisal it would have constituted patient care.

9

evaluated her general physical condition to determine her suitability for transfer to another facility, and that these tasks were "textbook nursing functions." Plaintiff argues *Rand* is distinguishable because the attorney for the estate who hired plaintiff testified that she did not hire him " 'as a nurse' " and plaintiff expressly told her that he was not providing nursing care. We are not persuaded that this testimony meaningfully distinguishes *Rand*, particularly because other documentary evidence indicates that plaintiff was hired because of his nursing background. The contract between plaintiff and the attorney for the estate requires that plaintiff have and maintain his license to practice nursing. Further, the administrators of the estate wrote to CCL, stating that plaintiff had been hired "to evaluate each of the residents for relocation and recommend the best type of facility for each resident . . . ." Plaintiff then did so and signed the required documentation as a registered nurse using his "RN" designation. Plaintiff's efforts to distinguish *Rand* are unpersuasive.

## II. *The Board applied the correct standard of care.*

Plaintiff argues the Board should not have applied a nursing standard of care to the resident appraisal and that the ALJ erred by relying on expert testimony to make this legal determination. Plaintiff's argument is entirely dependent upon his position that he did not perform the duties of a registered nurse. As discussed *ante*, substantial evidence supports the factual finding that plaintiff engaged in a "nursing function" when he conducted J.N.'s resident appraisal. Thus, applying a nursing standard of care to evaluate plaintiff's conduct was proper.

The Board's regulations establish that the standard of care in disciplinary proceedings involving licensed nursing functions is to exercise the degree of "care which, under similar circumstances, would have

10

ordinarily been exercised by a competent registered nurse." (Cal. Code Regs., tit. 16, § 1442.) The Board's findings of gross negligence and unprofessional conduct were based on the ALJ's findings that plaintiff's conduct was an "extreme departure from the standard of care in carrying out nursing functions in connection with the appraisal of J.N. . . . ."[6] These findings were supported by the record, including expert testimony. (See *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 969 [expert testimony is necessary to establish nursing standard of care and to evaluate alleged breaches, except where negligence is obvious to laypersons].)

Plaintiff further argues that implying a different standard of care for resident appraisals performed by licensed nurses renders the California Residential Care Facilities for the Elderly Act (Health & Saf. Code, § 1569 et seq.) impermissibly vague and uncertain. We agree with the Board that its decision does not imply a standard of care into the act. Rather, the Board's decision is based upon its finding that plaintiff performed a nursing function and breached the standard of care for nurses set forth in the regulations applicable to nurses. (Cal. Code Regs., tit. 16, § 1442.)[7]

---

[6] Specifically, the expert witnesses testified that a nurse performing a resident appraisal should perform a functional, head-to-toe assessment, looking at all of the skin. The evidence supports the ALJ's finding that plaintiff's assessment of J.N. was inadequate because he failed to identify and fully describe her multiple wounds.

[7] Plaintiff also argues he had no duty to provide nursing services to J.N. because there was no nurse–patient relationship between him and J.N. Again, this argument is premised upon plaintiff's position that his resident appraisal of J.N. was not a nursing function. Under the facts of this case, plaintiff's premise is faulty and his related argument based on a purported lack of a nurse–patient relationship also fails.

The ALJ decision, adopted by the Board, found that plaintiff had a duty to J.N. as a registered nurse and he was subject to the standard of care applicable to registered nurses. This finding implies the existence of a

To summarize, a licensed nurse may be subject to discipline by the Board when he or she agrees to assess a resident's physical and mental condition; holds him- or herself out as a licensed professional while doing so; and knows that his or her assessment will be, and in fact is, relied upon to determine the level of care the resident needs in a new facility. Applying some undefined, lesser standard of care to plaintiff's misconduct under these

---

nurse–patient relationship, which is supported by substantial evidence. The Board's registered nursing expert testified that the performance of an RCFE assessment by a nurse creates a nurse–patient relationship. Plaintiff's own expert similarly acknowledged that performing resident assessments constitutes patient care.

Plaintiff relies upon *Keene v. Wiggins* (1977) 69 Cal.App.3d 308, 313–314 (physician retained by workers' compensation carrier to examine injured employee for purpose of rating injury "has no reason to believe the person examined will rely upon this report," and is not liable to the person examined for negligence in making the report) and *Felton v. Schaeffer* (1991) 229 Cal.App.3d 229, 236–237 (no physician–patient relationship between physician hired to perform preemployment physical examination and prospective employee because the "physician's sole function was to provide information to aid the employer's decisionmaking process, not to serve the [prospective employee]"). Both cases are distinguishable because they address whether the physicians have civil liability for negligence as opposed to whether they are subject to discipline by a licensing board. (*Keene*, at p. 310; *Felton*, at p. 234.) Further, in neither case was it foreseeable that the patient would rely upon the physician's report. (*Keene*, at pp. 313–314; *Felton*, at pp. 236–237.) In contrast, here, J.N.'s assessment was performed to determine the level of care she needed when she was transferred from Nina's. This was most certainly for J.N.'s benefit. Plaintiff even acknowledged as much when he testified that the reason for completing the assessment was to assist the residents in choosing their next home. It was foreseeable that J.N., through her conservator, would rely upon the assessment, and, in fact, she did so. Under these circumstances, plaintiff is subject to discipline by the Board. The issue whether plaintiff could be held liable in a civil action for his misconduct is not before us, and we express no opinion on this question.

circumstances is counter to the Board's "highest priority" of public protection. (§ 2708.1.)

### III. *The Board was not required to plead a violation of the RCFE statutes.*

Plaintiff complains that he cannot be disciplined for failing to properly perform J.N.'s resident appraisal as required by RCFE statutes and regulations because (1) the Board did not plead violations of any specific RCFE regulations and (2) the Board does not have the power to discipline plaintiff for violations of the RCFE regulations. We address plaintiff's latter argument first. The Board disciplined plaintiff for gross negligence and unprofessional conduct while engaged in nursing functions. This is well within the Board's jurisdiction. (See *Rand, supra*, 206 Cal.App.4th at pp. 581–582 [rejecting argument that Board of Psychology lacked jurisdiction to discipline licensed psychologist for unprofessional conduct while acting as court appointed special master].)

Nor do we agree the Board was required to plead specific violations of RCFE regulations to discipline plaintiff for gross negligence under Business and Professions Code section 2761, subdivision (a)(1). The Board's accusation alleged plaintiff was hired to assist with the closure of Nina's and that he was grossly negligent in, among other things, failing to perform a complete assessment of J.N., failing to ensure that her service plan accurately reflected her needs and status, and failing to recommend a higher level of care. The Board further alleged incompetence and unprofessional conduct based upon the same alleged omissions. Although the Board did not specifically reference RCFE regulations, it did allege that the assessment was required by the CCL as part of the closing process. Finally, the Board alleged unprofessional conduct based upon plaintiff's dishonesty during the Board's investigation. The accusation detailed plaintiff's alleged errors and omissions in conducting

13

J.N.'s assessment and asserted that each cause for discipline was based upon violations of Business and Professions Code section 2761, subdivision (a)(1). No more was required. (Gov. Code, § 11503, subd. (a) [requiring that agencies set forth in the accusation acts and omissions with which the licensee is charged and specify "statutes and rules that the [licensee] is alleged to have violated"].)[8]

## IV. *Plaintiff's dishonesty during the investigation constitutes unprofessional conduct under section 2761.*

Plaintiff's final contention is that he cannot be disciplined for dishonesty because section 2761 does not expressly list dishonesty as a type of unprofessional conduct.[9] Plaintiff's argument ignores that the plain

---

[8] Plaintiff's reliance upon *Linda Jones General Builder v. Contractors' State License Board* (1987) 194 Cal.App.3d 1320 is misplaced. In *Linda Jones General Builder*, the Contractors' State License Board alleged a contractor was subject to discipline for a willful departure from " 'accepted trade standards *in the absence of specific requirements in the plans or specifications,*' " and then, at the hearing, the board argued the contractor should be disciplined for a willful departure from plans or specifications. (*Id.* at p. 1323, italics added.) The court found that because the board had not charged the contractor with a willful departure from plans or specifications, the contractor could not be disciplined on this ground. (*Id.* at pp. 1326–1327.) Here, plaintiff was charged with violating section 2761, subdivision (a)(1), and the disciplinary action was based upon this accusation.

[9] In making the legal argument that he cannot be disciplined for dishonesty under section 2761, plaintiff does not appear to dispute that substantial evidence supports the finding that he was dishonest. However, his brief also includes a section titled "Conclusion" which disputes that he was dishonest during his interviews with the Board investigator. We disregard this argument for three reasons. First, plaintiff's argument is not under an appropriate heading. (See *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 453–454 [argument contained in section headed " 'Introduction' " violates Cal. Rules of Court, rule 8.204(a)(1)(B) requiring separate headings summarizing argument and is forfeited].) Second, plaintiff fails to cite to the appellate record. (*Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 741 [Cal. Rules of Court, rule 8.204(a)(1)(C), requiring appellate briefs to cite to

14

language of section 2761, subdivision (a) provides a non-exhaustive list of what constitutes "unprofessional conduct." It expressly states that unprofessional conduct "includes, but is not limited to," the examples listed. (§ 2761, subd. (a); *Moustafa v. Board of Registered Nursing* (2018) 29 Cal.App.5th 1119, 1136 [recognizing that additional forms of conduct may be deemed unprofessional conduct because § 2761, subd. (a) provides that unprofessional conduct " 'is not limited to' " the examples given].) Courts have held that unspecified " 'unprofessional conduct' " must involve "conduct which indicates an unfitness to practice [the profession]." (E.g., *Shea v. Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 575; *Rand, supra*, 206 Cal.App.4th at p. 590 ["A professional who has shown dishonesty has demonstrated professional unfitness meriting license discipline"].)

Plaintiff was found to have been dishonest with the Board investigator when he characterized his role in J.N.'s assessment as significantly more limited than what he explained in his earlier statement to the CCL investigator. We find that such dishonesty to the Board investigating plaintiff's alleged malfeasance constitutes unprofessional conduct and demonstrates an unfitness to practice nursing.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

---

appellate record, applies to matter references at any point in the brief and not just to the statement of facts].) Third, he makes no reasoned argument that the Board's finding is not supported by substantial evidence. (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 600 [appellant is required to present cognizable legal argument in support of reversal of judgment], disapproved on other grounds in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012, fn. 2.)

15

_____
Jackson, P. J.

WE CONCUR:


_____
Needham, J.


_____
Burns, J.


A159990/*Clawson v. Bd. of Registered Nursing*


16

A159990/Clawson v. Bd. of Registered Nursing

Trial Court:        Superior Court of the City and County of San Francisco

Trial Judge:        Ethan P. Schulman

Counsel:        William Michael Clawson, in pro. per., for Plaintiff and Appellant.

Rob Bonta, Attorney General, Carl W. Sonne, Assistant Attorney General, Joshua A. Room and Brett A. Kingsbury, Deputy Attorneys General, for Defendant and Respondent.