[No. B200659. Second Dist., Div. Eight. Nov. 13, 2008.]

ELLEN HUGHES FINNERTY, Plaintiff and Appellant, v.
BOARD OF REGISTERED NURSING, Defendant and Respondent.

COUNSEL

Phyllis M. Gallagher for Plaintiff and Appellant.

Diane Trace Warlick for The American Association of Nurse Attorneys as Amicus Curiae on behalf of Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Alfredo Terrazas, Assistant Attorney General, Karen B. Chappelle, Marc D. Greenbaum and Rene Judkiewicz, Deputy Attorneys General, for Defendant and Respondent.

OPINION

COOPER, P. J.—

### SUMMARY

Ellen Hughes Finnerty, a registered nurse, petitioned for a writ of mandate requiring the Board of Registered Nursing (Board) to set aside its decision disciplining her for gross negligence and incompetence. The Board disciplined Finnerty in connection with an incident during which Finnerty refused to comply with a resident physician's order that a patient be intubated immediately in his room, and instead insisted on first moving (and did move) the patient to the intensive care unit, where the intubation was then performed. The trial court found the weight of the evidence supported the Board's conclusion that Finnerty's conduct constituted both incompetence and gross negligence, and denied Finnerty's petition. Because the trial court's findings are supported by substantial evidence, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of August 17, 2002, Finnerty, a nurse with more than 20 years of experience, was working as a "resource" or "charge" nurse,

responsible for (among other duties) monitoring the condition of patients in two stations, including a "subacute" unit (station 25), at Huntington Memorial Hospital. One of the patients in station 25 was James C., a 55-year-old man with Down syndrome and multiple illnesses (the patient). The patient began to suffer from respiratory distress, and between 3:00 and 4:00 a.m., the nurse caring for him, Ann-Mugi, called a respiratory therapist (Hiran Obeyesekere) to assist her. The patient's respiration was rapid and labored, with oxygen saturation of only 70 percent. Obeyesekere suctioned the patient's pharynx to help prevent airway blockage, and Mugi called the telephone exchange of the patient's primary care physician (Dr. Jackson), reporting a respiratory rate of 40 breaths per minute (rather than the normal 12–20 per minute) and a low urinary output.

At 4:40 a.m., Mugi received Dr. Jackson's orders for 100 percent oxygen via a nonrebreather mask, various blood tests, a diuretic, and to keep the patient's blood oxygenation level above 94 percent.

About 5:30 a.m., the patient's respiration continued to be labored (36–40 breaths per minute). Obeyesekere again suctioned mucus from the patient's pharynx, allowing him to breathe well for a few minutes; the patient's blood oxygenation level was then 95 percent. The medical records show a followup order from Dr. Jackson, also at 5:30 a.m., directing transfer of the patient to the ICU (intensive care unit) for "respiratory failure impending code" and directing the "medical resident to intubate [patient] stat." (This order was not recorded in the patient's records until after the pertinent events occurred, so Finnerty was unaware of Dr. Jackson's order.)

At approximately 6:00 a.m., Mugi paged Dr. Hengemeh Monsef, the medical intern on call. When Dr. Monsef arrived, Mugi informed her Dr. Jackson had requested the patient be intubated and prepared for transfer to the ICU. Dr. Monsef examined the patient and found him barely responsive, lethargic, breathing rapidly, and appearing very sick and weak, with an altered level of consciousness. She confirmed the need for an arterial blood-gas analysis, and Obeyesekere took a blood sample to the lab for analysis. Between 6:00 and 6:15 a.m., Finnerty also came to the patient's room, along with respiratory therapist Joey Lee. Finnerty examined the patient, but did not discuss her findings with Dr. Monsef, who ordered the patient to be transported to the ICU. Finnerty left to telephone the ICU to reserve a bed.

At 6:30 a.m., Obeyesekere returned with the lab results, which indicated acidosis and insufficient blood oxygenation. Dr. Monsef concluded the patient was too unstable to be transported to the ICU and needed his airway secured

first; she paged the on-duty resident, Dr. Jennifer Nguyen, Monsef's immediate supervisor, to assist with the clinical decision of whether to intubate the patient. Nguyen arrived within five minutes of being paged. When Nguyen arrived, Finnerty was helping the respiratory therapists prepare to transport the patient to the ICU. Nguyen found the patient "cyanotic" ("whitish-blue" or "thoroughly pale"), and Dr. Monsef told her the patient was unstable and needed to be intubated.

Dr. Nguyen agreed with Dr. Monsef, informed everyone in the room that the patient was to be intubated, and instructed Obeyesekere to obtain the necessary supplies (which were on a "crash cart" on the floor). Obeyesekere left to do so. Finnerty told Dr. Nguyen that she could not intubate the patient on the floor and that the patient was first to be taken to the ICU. Nguyen repeated her intention to intubate the patient immediately, but Finnerty proceeded to unplug the bed from its electrical outlet and maneuver the bed out of the room. All personnel in the room, including Dr. Nguyen, followed the patient as Finnerty and Lee transported him to the ICU, which was on another floor of the hospital; the trip to the ICU took approximately five minutes. The patient was transported without any device for monitoring his cardiac status or vital signs; he received oxygen from a portable tank during the transport.

The patient and entourage arrived at the ICU at approximately 6:50 a.m.; morphine sulfate was administered and Dr. Monsef successfully intubated the patient. At 7:00 a.m., his respiration was 20 breaths per minute. His vital signs, which were normal on arrival at the ICU, fluctuated during the next several minutes.[1] At 7:20 a.m., a code blue (see fn. 4, *post*) was initiated; cardiopulmonary resuscitation began at 7:23 and the patient died at 7:30. There was no evidence the delay in intubating the patient caused or contributed to his death.[2]

Dr. Nguyen entered a "code blue note" on the patient's record at 7:45 a.m., recording the incident substantially as described above.[3] At 9:00 a.m.,

---

[1] Normal vital signs are not determinative or significant with respect to whether a patient is in respiratory distress or should be intubated.

[2] Dr. Monsef testified that the cause of death was not respiratory distress; the patient had "other problems," including renal deficiency.

[3] "On [Nguyen's] arrival it was very apparent [patient] needed to be immediately intubated in light of [patient] being cyanotic on 100% mask & [with very decreased] respirations which nurse reports had been occurring since 0400. [Patient] was very exhausted & need intubation stat. I told the [respiratory tech] Hiran Obeyesekere to get me supplies to intubate & he tried but nurse Ellen Finnerty said 'No you are not intubating him here, you have to do it in the ICU' so I repeated, 'I am intubating here now not in the ICU' & she said again no . . . & her & another [respiratory] tech . . . started pushing the [patient's] bed out of the room & Ellen said she was taking responsibility for the [patient]. . . ."

Finnerty wrote an "occurrence report" of the incident which included the statement that she "[c]ountermand[ed] the order of Dr. Nguyen . . . ." She wrote that when Nguyen said she wanted to intubate in the room, she [Finnerty] said the equipment and staff were not adequate and the patient should be moved to the ICU, and "Dr. Nguyen repeated request to intubate on the floor." Finnerty further observed that the patient was "awake, but lethargic," was "breathing spontaneously with palpable pulses," was "viable at the time" and would have had to be transported to the ICU after intubation "at much risk due to the obvious complications"; an "unnecessary intubation and code blue on the station 25, especially at change of shift" would compromise all the patients on the unit.

A few days after the incident, Huntington Memorial Hospital terminated Finnerty's employment, listing "gross negligence—failure to follow direction from treating physician" as the reason for the termination. The hospital's discharge memorandum stated Finnerty had refused the physician's order and transported the patient to the ICU without a cardiac monitor or a secure airway, thereby placing the patient in an unsafe environment. Finnerty noted her disagreement with the hospital's finding "due to the lack of a direct order to me by the physician to do or not do anything and the knowledge that the patient was transported to ICU faster than a code team could have come to the room." Finnerty's subsequent legal action against the hospital was settled by cancelling Finnerty's termination in exchange for her agreement to resign. Finnerty is currently employed at Glendale Adventist Medical Center.

In April 2005, the Board of Registered Nursing filed an accusation in connection with the August 17, 2002 incident, alleging unprofessional conduct and gross negligence and incompetence and seeking the revocation or suspension of Finnerty's license. A hearing was held before an administrative law judge (ALJ) in January 2006. The evidence and testimony from Nguyen, Monsef, Obeyesekere and Lee revealed the facts recited above. In addition, there was other evidence and testimony from several other witnesses, including:

—Susan Turner, an expert presented by the Board, opined that, while Finnerty may have believed she was acting in the best interest of the patient, she was wrong; while it is permissible for a registered nurse to disobey an order that is inaccurate or unsafe, the documentation Turner reviewed did not indicate this was such a case. The patient had been in respiratory distress for an extended period of time; intubation in the room was a viable clinical option; and if insufficient staff was then present (or in case of a complication during or after intubation), a code blue could have been called.[4]

---

[4] Code blue refers to the broadcast alert and procedures for responding to a medical emergency in the hospital, bringing qualified personnel and equipment to the location of the emergency.

—Zumfiqar Ahmed, a physician specializing in internal and pulmonary medicine, knew Finnerty from working with her at Glendale Adventist. He testified he had confidence in Finnerty's judgment; given a choice, it is preferable to intubate in the ICU; it is appropriate for a nurse to question a doctor's order; and, in this case, intubation should have taken place in the ICU and Finnerty's actions were reasonable under the circumstances.

—Punnoose Varghese, the nursing director at Glendale Adventist, also testified in Finnerty's behalf. He indicated that intubation can occur anywhere, depending on the patient's need, available qualified personnel and equipment, and hospital procedures; it depends on the totality of the circumstances. Registered nurses do not make the decision to intubate a patient.

—A November 24, 2003 declaration from Finnerty, which she prepared in connection with the Board's investigation, was presented. The ALJ observed that the declaration "varied significantly from her own testimony during the hearing . . . ." In her declaration, Finnerty stated, "I had reason to doubt, very seriously, Dr. [Nguyen's] abilities to intubate." At the hearing, she said that Dr. Nguyen's ability was "a concern," but "[t]hat was not my reason." In her declaration, she asserted that, "[n]ot only did the clinical picture not clearly support intubation, but the criteria for intubation . . . were not fully met." At the hearing, Finnerty admitted that "the patient needed to be intubated."

—In emergency situations, ensuring a patient's airway is the first priority of patient management, and intubation is one of the most important and desirable interventions, providing maximum control of the airway in patients who are in respiratory distress. Intubation has risks, but they are minimal when conditions warrant intubation and trained personnel and equipment are available to perform the procedure.

The ALJ concluded there was clear and convincing evidence of gross negligence and incompetence within the meaning of the applicable statute and regulations. In the course of his discussion, the ALJ found that:

—"Inconsistencies in [Finnerty's] testimony, inconsistencies between her testimony and written declaration, and her evasive and misleading responses to questions, lead the administrative law judge to question [Finnerty's] credibility."

—During the hearing, Finnerty testified there were many reasons for countermanding Dr. Nguyen's orders, including her understanding that in-room intubation was not the norm at the hospital; intubation has risks, especially

with a Down syndrome patient; the underlying cause of the patient's respiratory distress was metabolic acidosis; and, if intubated, mechanical ventilation would have been required during transport to the ICU, which is dangerous. However, Finnerty "did not communicate any of these concerns to the patient's medical team at the time of the incident. She merely substituted her own clinical judgment for those of the two attending physicians."

—Finnerty "failed to work collaboratively with Dr. Monsef and Dr. Nguyen . . . and usurped the responsibility and decision-making authority of the senior health care provider without effectively communicating any concerns [she] may have had."

The Board adopted the ALJ's proposed decision. Finnerty sought and obtained reconsideration. The Board issued a final decision, effective January 7, 2007, incorporating the ALJ's decision; the Board revoked Finnerty's license, stayed the revocation and placed Finnerty on probation for three years.

Finnerty petitioned for a writ of administrative mandamus requiring the Board to set aside its decision. The trial court denied the writ, finding the weight of the evidence supported the finding that Finnerty's conduct was grossly negligent and/or incompetent: "The record reflects that Dr. Nguyen determined that the patient needed to be intubated prior to transfer to ICU, yet that [Finnerty] repeatedly insisted that the transfer should occur prior to intubation, and then forcefully maneuvered the patient's bed out of the room. Given the condition of the patient as described by the witnesses testifying at the hearing and the medical records and statements of those involved admitted in evidence, as well as the events surrounding the patient's transfer to the ICU, a considerable distance from his ward, the weight of the evidence supports the [Board's] findings and conclusion . . . ."

Finnerty filed a timely appeal, and we permitted The American Association of Nurse Attorneys to file a brief as amicus curiae on Finnerty's behalf.

## DISCUSSION

The substance of Finnerty's claim on appeal is that (1) she was required by the Board's standards of competent performance (Cal. Code Regs., tit. 16, § 1443.5, subd. (6)) "to act as Mr. C.'s advocate by taking him to the ICU for intubation, rather than permitting intubation to take place in an environment that was not equipped for intubation," and (2) the evidence in the record does

not support the findings that her conduct constituted gross negligence or incompetence under the facts and law of this case. Before addressing and rejecting Finnerty's claims, we note the standard of review in cases of license revocation, and describe the applicable statute and regulations.

### 1. *The standard of review.*

When a trial court rules on a petition for writ of mandate following a license revocation, it must exercise its independent judgment to determine whether the weight of the evidence supported the administrative decision. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–144 & fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 69 [64 Cal.Rptr. 785, 435 P.2d 553] (*Yakov*); *Hildebrand v. Department of Motor Vehicles* (2007) 152 Cal.App.4th 1562, 1567–1568 [62 Cal.Rptr.3d 234].) After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court's function "is solely to decide whether credible, competent evidence supports [the trial] court's judgment." (*Yakov, supra,* 68 Cal.2d at pp. 69, 72 ["the question before this court turns upon whether the evidence reveals substantial support, contradicted or uncontradicted, for the trial court's conclusion . . ."].)

### 2. *The applicable statute and regulations.*

■ The Board's accusation against Finnerty was founded on Business and Professions Code section 2761, which permits the Board to take disciplinary action against a licensed nurse for unprofessional conduct, which includes "[i]ncompetence, or gross negligence in carrying out usual certified or licensed nursing functions." (Bus. & Prof. Code, § 2761, subd. (a)(1).) The Board's regulations define gross negligence as including "an extreme departure from the standard of care which, under similar circumstances, would have ordinarily been exercised by a competent registered nurse." (Cal. Code Regs., tit. 16, § 1442.) The meaning of an "extreme departure" includes "failure to provide care or to exercise ordinary precaution in a single situation which the nurse knew, or should have known, could have jeopardized the client's health or life." (*Ibid.*) Incompetence means "the lack of possession of or the failure to exercise that degree of learning, skill, care and experience ordinarily possessed and exercised by a competent registered nurse as described in Section 1443.5." (Cal. Code Regs., tit. 16, § 1443.) Section 1443.5 of the regulations provides standards of competent performance for registered nurses. Those include evaluation of the effectiveness of a care plan (and its modification as needed), through observation of the client's condition, behavior, symptoms and reactions and "through communication with the

client and health team members . . . ." (Cal. Code Regs., tit. 16, § 1443.5, subd. (5).) The standards of competent performance also require the nurse to act "as the client's advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests or wishes of the client . . . ." (*Id.*, § 1443.5, subd. (6).)

### 3. *Finnerty's contentions.*

Finnerty contends this case requires us to interpret section 1443.5, subdivision (6) of title 16 of the California Code of Regulations—requiring registered nurses to act as the patient's advocate—and also to decide whether the laws defining gross negligence and incompetence were properly applied to the facts of this case. Further, Finnerty contends that our review is de novo, because "[m]ost of the material facts in this case are undisputed," and the issues on appeal "concern the proper characterization of those facts, as well as the controlling legal principles in light of those facts." We cannot agree with Finnerty's proposition that this case involves the "proper characterization" of undisputed facts, or that the case is subject to de novo review. On the contrary, we must affirm the trial court's judgment, which was supported by substantial evidence and which properly applied the law to the facts.

First, the facts: while asserting most of them are undisputed, Finnerty's brief shows otherwise. She says Dr. Nguyen was wrong in describing the patient as "cyanotic," because no other witnesses at the hearing described him as cyanotic. She claims that the patient's vital signs and oxygen saturation were sufficient for him to be transferred safely to the ICU (citing her own testimony). She suggests that Dr. Nguyen ceded responsibility for the patient to Finnerty by allegedly saying, "The responsibility is yours." She says there was "little or no delay" in intubating the patient, and any delay "was necessitated by the need to move Mr. C. to a safe location for intubation." She asserts that the underlying cause of the patient's respiratory distress "should have been addressed prior to intubation," despite undisputed testimony from several witnesses that, in emergency situations, ensuring a patient's airway is the first priority of patient management. She claims the evidence showed "she actually avoided a more precipitous course of events by transferring Mr. C. to the ICU." All of these are the facts as Finnerty sees them—but the fact finder obviously disagreed, and there was plenty of evidence to support contrary findings.

■ Second, we do not doubt there are circumstances justifying a nurse's refusal to follow a doctor's order, and we do not question a nurse's duty to act as the patient's advocate "by initiating action . . . to change decisions . . .

which are against the interests" of the patient. (Cal. Code Regs., tit. 16, § 1443.5, subd. (6).) Even the Board's expert agreed it is permissible for a registered nurse to disobey a physician's order that is inaccurate or unsafe, and one can readily conjure circumstances, as amicus curiae points out, under which vigilant nurses who question physician orders save patients from harm—such as with errors in medication. But in this case, the question whether the physician's order was inaccurate or unsafe, or against the interests of the patient, has been resolved in favor of the physician, not the nurse who countermanded it. Moreover, the Board found that Finnerty "did not communicate any of [her] concerns"—the ones she proffered at the hearing—to the patient's medical team at the time of the incident. Indeed, the only concern she actually communicated to Nguyen and Monsef—accepting her own version of events as correct—was that the equipment and staff were not adequate on station 25. But Nguyen and Monsef were fully trained to intubate, and the equipment was on the "crash cart." Instead, in an emergency situation, Finnerty "merely substituted her own clinical judgment for those of the two attending physicians." Under these circumstances, we cannot disagree with the conclusion that Finnerty's conduct constituted a "failure to provide care or to exercise ordinary precaution in a . . . situation which the nurse knew, or should have known, could have jeopardized the client's health or life." (Cal. Code Regs., tit. 16, § 1442.)

Finally, amicus curiae argue that, as a matter of policy, the "harsh nature of the discipline imposed on [Finnerty]" will "unduly constrain the exercise of nursing judgment." Nurses "might be more likely to simply follow the physician's order rather than question it under the urgent circumstances similar to what [Finnerty] faced," and "many patients would be harmed by preventable errors." But this was not a case of "preventable error," as where a nurse identifies an error in a doctor's order that could be corrected by pointing it out; it was a question of whose clinical judgment should prevail in a medical emergency. In any event, it is not the role of this court to determine matters of policy; it is our role to decide whether the record showed "substantial support, contradicted or uncontradicted," for the trial court's conclusion that the weight of the evidence supported the Board's finding.[5] (*Yakov, supra*, 68 Cal.2d at p. 72.) Because our review of the record discloses the trial court's judgment was amply supported by the evidence, we necessarily affirm the judgment.

---

[5] Amicus curiae also contends there should be "a mild and middle range of possible disciplinary action between no action at all and revocation of a license." Again, that is not a question for this court; the Board imposed the minimum discipline available under its guidelines, staying the revocation of Finnerty's license with three years' probation.

## DISPOSITION

The judgment is affirmed. The Board of Registered Nursing is to recover its costs on appeal.

Rubin, J., and Bigelow, J., concurred.