Filed 2/11/26  Kuigoua v. Board of Registered Nursing CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ARNO PATRICK KUIGOUA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BOARD OF REGISTERED NURSING, <br><br> Defendant and Respondent. | C101035 <br><br> (Super. Ct. No. 23WM000040) |

Appellant Arno Patrick Kuigoua challenges the revocation of his nursing license by respondent California Board of Registered Nursing (Board).  Kuigoua was terminated from his job at a nursing home run by the California Department of Veterans Affairs (CalVet) based on substantiated allegations of sexual harassment and failures to care for patients.  The State Personnel Board (SPB) affirmed the termination decision.

The Board then revoked Kuigoua's nursing license, and the trial court denied his petition for writ of administrative mandate.  The court concluded that, under principles of collateral estoppel, Kuigoua was bound by the adverse factual findings of the SPB.

1

Alternatively, the court found no error in the Board's conclusion that Kuigoua committed the alleged misconduct. On appeal, Kuigoua argues that the trial court erred when it applied collateral estoppel and that the evidence was insufficient to warrant revocation of his license. We conclude that, regardless of any error in the trial court's reliance on principles of collateral estoppel, sufficient evidence supports the trial court's decision and the Board acted within its discretion in revoking Kuigoua's license. We affirm the judgment.

BACKGROUND

I.

Kuigoua worked as a registered nurse at a nursing home for veterans operated by CalVet. He received positive performance evaluations, but several issues emerged concerning his behavior toward coworkers and his care of patients, ultimately leading to his termination in 2018.

A.

According to testimony before the Board, Kuigoua made crude sexual gestures and comments to three of his coworkers. S.W., an office assistant, testified that Kuigoua grabbed his penis over his pants and shook it at her when he saw her walking down the hall. She said that her boyfriend also worked at the nursing home and Kuigoua would only bother her when her boyfriend was around. Kuigoua would get close to her and whisper in her ear as if he were asking her about dating. She believed he did this to upset her boyfriend. S.W.'s boyfriend died in May 2021.

S.S., a licensed vocational nurse (LVN), testified that Kuigoua saw some of her family wedding pictures and made comments about how he wanted her to "hook him up" with her cousins because he liked Indian women. Kuigoua was married, but said he was single; he said he would leave his keys so that T.A., another LVN, could come and visit him at home. He told T.A. his condom size. S.S. believed that Kuigoua was flirting with her and T.A. S.S. and T.A. reported his comments, and the report was documented in a

July 2017 email that was admitted into evidence. On another occasion, when S.S. was handing Kuigoua a pair of gloves, he made an innuendo about the size of his genitals. Kuigoua denied making inappropriate comments and said that he only meant he wanted S.S. to "hook him up" with a home rental in India if he traveled there.

In March 2018, Kuigoua sent emails to T.A. chastising her for various failures in her job duties, including a failure to update a resident's file and administer medication. One email said that T.A. had "failed to perform within the acceptable standard of [her] profession and license" and raised the possibility of "disciplinary action by the Board of Nursing against [her] license as the result of inadequate or nonexistence of documentation."

Elvie Ancheta, the administrator of the nursing home who was copied on the emails, replied and instructed Kuigoua to let the supervising registered nurse handle any reprimands. Ancheta asked Kuigoua to report any employee concerns to his supervising registered nurse. According to Ancheta, Kuigoua was not T.A.'s supervisor and it was not within his job duties to reprimand LVNs. She explained that the emails were problematic because they discussed legal issues such as potential disciplinary action by the Board and were directed at T.A., so they were perceived as retaliatory for the earlier sexual harassment complaint. According to Kuigoua, his responsibilities included supervising LVNs. He had previously sent similar emails to others, without any concerns being raised.

B.

Testimony before the Board also showed that two patients in Kuigoua's care suffered falls.

Each resident at the nursing home had an individualized care plan. The care plan included, among other things, a comprehensive nursing assessment and fall risk assessments. According to the nursing home's policies, the care plan had to be updated

3

"whenever a significant change in condition is noted." Updating the care plan was the responsibility of the assigned registered nurse.

Patient Mr. D fell on February 2, 3, and 9, 2018 and on March 6, 2018. He passed away on March 18, 2018, after another fall. Kuigoua updated Mr. D's care plan and conducted a fall risk assessment in 2017. He did not conduct fall risk assessments or comprehensive nursing assessments after Mr. D's falls in February or on March 6. On February 2, 2018, Kuigoua completed a physical examination of Mr. D and added notes to the file. He also updated Mr. D's care plan on March 6 to reflect a doctor's order for railings on Mr. D's bed.

Kuigoua testified that not every fall qualifies as a significant change in a patient's condition. He said that he reappraised Mr. D every time there was a significant change in condition. Kuigoua did not update the care plan on February 3 or 9 because interdisciplinary team meetings determined that the current plan was appropriate.

In July 2018, patient Mr. A was sent to an outside clinic for surgery with an overnight stay. The morning after the surgery, the nursing home needed to send a driver and escort to pick him up. An escort could be assigned by an LVN, a registered nurse, or the supervising registered nurse. According to Ancheta, the person with "the highest level of professional title" on the team was responsible for making sure an escort was provided. According to S.W., the clinic called and said that Mr. A was ready to be picked up. S.W. could not authorize an escort, so she told Kuigoua to contact the clinic to coordinate. She later received calls from the clinic saying that Kuigoua had not called.

According to Kuigoua, he called the clinic and could not reach the charge nurse but spoke to a case manager instead. The case manager said she would get a charge nurse to call him back, but no one did. He also spoke with the nursing home driver, who told him that Mr. A needed an escort. The driver said that he would go to the nursing station, so Kuigoua believed the situation had been handled.

4

A different driver without an escort went to pick up Mr. A.  Mr. A fell when the driver was picking him up.

## II.

In 2018, CalVet fired Kuigoua after substantiating the sexual harassment allegations regarding T.A. and S.S. and because of patient care failures, including those concerning Mr. D and Mr. A.  Kuigoua challenged his termination before the SPB.

After hearing testimony in April 2019, the administrative law judge (ALJ) sustained Kuigoua's dismissal.  The ALJ found by a preponderance of the evidence that Kuigoua had engaged in inappropriate sexual conduct toward T.A., S.S., and S.W.; did not conduct appropriate assessments for Mr. D after he fell on February 2, 3, and 9, 2018 and on March 6, 2018; failed to arrange a transportation escort for Mr. A in July 2018; and sent "condescending and obnoxious" emails reprimanding T.A.  The SPB adopted the ALJ's decision.

Kuigoua filed a petition for writ of administrative mandate challenging his termination.  The trial court denied the petition, and this court affirmed.  (*Kuigoua v. State Personnel Board* (Nov. 17, 2022, C094164) [nonpub. opn.].)

## III.

In October 2021, the Executive Officer of the Board filed an accusation against Kuigoua alleging that he should be disciplined based on unprofessional conduct, gross negligence, and incompetence.  The accusation sought to revoke or suspend Kuigoua's nursing license.

At the hearing on the accusation, the Board presented evidence concerning Kuigoua's conduct toward T.A., S.S., and S.W. and concerning his care for Mr. A and Mr. D.  Among other evidence, the Board sought to admit the transcript of T.A.'s testimony before the SPB, based on her unavailability to appear at the Board hearing.  Although the Board had subpoenaed T.A., she did not appear and refused contact with

the Board's attorney. Ultimately, the ALJ admitted her prior testimony from the SPB proceeding into evidence.

The Board also called Richie Malicse, an expert in the field of nursing, who testified about the standard of care. Regarding Kuigoua's communications with S.W. and S.S., Malicse opined that Kuigoua failed to meet standards of professionalism for a registered nurse.

Malicse also opined that Kuigoua fell below the standard of care in his care for Mr. D. According to Malicse, the February 2 updates did not meet the standard of care because they did not include anything to prevent future falls. The March 6 update was inadequate because it only accounted for falls when the resident was in bed. He also observed that the care plan was not updated after the February 3 and 9 falls. The previous fall risk assessment was also scored incorrectly, making the resident seem as if he were at a lower risk for a fall.

Malicse additionally testified that fall risk assessments are important to evaluate the patient's safety and to determine how to prevent falls in the future. A registered nurse should perform an assessment after a fall to see if the resident needs additional care or needs to be transported to a different facility. Even if two falls occurred in a short period of time, a new assessment should be performed after each fall.

Malicse opined that it was grossly negligent for Kuigoua not to perform the required assessments, and each fall constituted a "significant change in condition," requiring further updates to the resident's care plan. In Malicse's view, Kuigoua's failure to update the care plan also constituted incompetence.

Regarding patient Mr. A, Malicse testified that Kuigoua did not meet the required standard of care because he did not identify Mr. A's need for supervision, resulting in a fall.

After the hearing, the ALJ issued a proposed decision, finding by "clear and convincing evidence, that cause exists to discipline [Kuigoua's] registered nurse license."

6

The ALJ reasoned that principles of collateral estoppel barred Kuigoua from relitigating the SPB's factual determinations that he had sexually harassed T.A., S.S., and S.W.; sent inappropriate emails to T.A.; failed to complete a nursing assessment or update Mr. D's care plan after his falls; and failed to arrange an escort for Mr. A. The ALJ further determined that these acts amounted to unprofessional conduct, gross negligence, and incompetence. Kuigoua committed unprofessional conduct by sexually harassing T.A., S.S., and S.W.; by sending inappropriate emails to T.A.; and by failing to provide adequate care to Mr. D and Mr. A. He was grossly negligent and incompetent with respect to Mr. D and Mr. A. The ALJ observed that Kuigoua presented no evidence of rehabilitation and ordered his license revoked. The Board adopted the ALJ's decision.

Kuigoua filed a petition for writ of administrative mandate in the trial court asking it to set aside the Board's decision. Kuigoua argued that the Board erred in concluding that collateral estoppel precluded the litigation of factual findings from the SPB proceedings and, in any case, the evidence did not support the findings that Kuigoua committed misconduct, was grossly negligent, or was incompetent. At the hearing on the petition, Kuigoua argued, for the first time, that collateral estoppel should not apply because the burden of proof in the proceedings before the SPB was a preponderance of the evidence, while the burden of proof in the Board disciplinary proceeding was clear and convincing evidence.

The trial court issued a written decision denying Kuigoua's petition. The court concluded that "the ALJ did not err in finding collateral estoppel prevented [Kuigoua] from relitigating the factual determinations made in the SPB proceeding." The court held that Kuigoua had waived his argument as to the burden of proof by failing to raise it before oral argument. The court continued: "Even if [Kuigoua] *had* timely raised the argument, the Court is not persuaded that the ALJ erred in finding [Kuigoua] in fact committed the alleged improper conduct based upon the applicable standard of proof. The ALJ heard testimony from numerous witnesses, including [Kuigoua]. The ALJ

7

considered T.A.'s testimony before the SPB. The ALJ was aware of the burden of proof at issue as articulated by her, and there is no evidence that the ALJ deviated from this standard of proof in determining collateral estoppel applied." (Footnote omitted.) The trial court entered judgment against Kuigoua.

Kuigoua filed a timely notice of appeal.

DISCUSSION

Under Business and Professions Code section 2761, subdivision (a), the Board may take disciplinary action against a licensee for "[u]nprofessional conduct," including "[i]ncompetence or gross negligence in carrying out usual certified or licensed nursing functions." "Gross negligence" is defined as "an extreme departure from the standard of care which, under similar circumstances, would have ordinarily been exercised by a competent registered nurse. Such an extreme departure means the repeated failure to provide nursing care as required or failure to provide care or to exercise ordinary precaution in a single situation which the nurse knew, or should have known, could have jeopardized the client's health or life." (Cal. Code Regs., tit. 16, § 1442.) A failure to meet the standard of care can be established by expert testimony. (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 969.) "Incompetence" is shown by the failure to meet the standards defined in California Code of Regulations, title 16, section 1443.5, including the ability to "effectively supervise[] nursing care being given by subordinates," "[p]erform[] skills essential to the kind of nursing action to be taken," and "[e]valuate[] the effectiveness of the care plan through observation of the client's physical condition and behavior . . . and modif[y] the plan as needed." (Cal. Code Regs., tit. 16, §§ 1443, 1443.5.)

"When a trial court rules on a petition for writ of mandate following a license revocation, it must exercise its independent judgment to determine whether the weight of the evidence supported the administrative decision. [Citations.] After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court's

8

function 'is solely to decide whether credible, competent evidence supports [the trial] court's judgment.' " (*Finnerty v. Board of Registered Nursing* (2008) 168 Cal.App.4th 219, 227, brackets in original.) "We must resolve all conflicts in the evidence, and indulge all reasonable inferences, in favor of the superior court's judgment." (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 575.)

Kuiguoa contends that the trial court erred in applying collateral estoppel in denying his petition and that substantial evidence fails to support the revocation of his license. Regarding collateral estoppel, Kuigoua argues that the SPB's findings do not have preclusive effect because of the lower standard of proof in an SPB proceeding, that the trial court erred in refusing to consider this argument, and that this court should exercise its discretion to reach the issue on appeal. We need not consider these arguments because the trial court found, in the alternative, that "[e]ven if [Kuigoua] *had* timely raised the argument," the ALJ did not err in finding Kuigoua "in fact committed the alleged improper conduct based upon the applicable standard of proof." We find in the record sufficient evidence to support this conclusion.

First, sufficient evidence supports the conclusion that Kuigoua's conduct toward S.S., S.W., and T.A. was unprofessional. Kuigoua does not challenge the finding that he made sexual comments to S.S. His primary argument as to the sexual harassment allegations is that the Board should not have considered T.A.'s prior testimony from the SPB hearing because there was an inadequate showing that she was "unavailable" to testify at the Board hearing under Evidence Code section 1291. Even absent T.A.'s prior testimony, however, there was substantial evidence of harassing conduct by Kuigoua.

S.S. testified at the Board hearing about Kuigoua's conduct toward T.A., saying he made flirtatious comments about having T.A. visit him at home and confirming a report about Kuigoua telling T.A. his condom size. In addition, the ALJ admitted into evidence an email summarizing S.S. and T.A.'s report to a supervisor about Kuigoua's conduct, corroborating S.S.'s testimony. According to the email, both S.S. and T.A. reported that

9

Kuigoua flirted with many of the women at the nursing home and that T.A. did not like Kuigoua's advances. The ALJ also admitted S.W.'s boyfriend's testimony from the SPB hearing because the boyfriend had passed away before the Board hearing. S.W.'s boyfriend testified that he overheard Kuigoua say the word "penis" to T.A. T.A. told him that Kuigoua was "telling her how big his penis was, and if you go to my house, the money would be on the table when you get there." Kuigoua did not object to the introduction of the email or the boyfriend's testimony when they were offered into evidence, forfeiting his current assertion that they cannot now be considered. (Evid. Code, § 353, subd. (a); *People v. Perez* (2020) 9 Cal.5th 1, 7 [" 'the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted' "].)

Substantial evidence in the record likewise supports the conclusion that Kuigoua inappropriately reprimanded T.A. via email. The emails themselves were admitted into evidence by stipulation. Kuigoua contends that his job responsibilities included providing training to LVNs and claims that there is no evidence he continued to send emails after he was told to stop. But as Ancheta testified, the specific circumstances of these emails made them problematic, both because they raised the specter of legal disciplinary action, rather than merely correcting T.A.'s job performance, and because they were potentially retaliatory following Kuigoua's harassment of T.A. It was thus reasonable to interpret the emails as showing a pattern of unprofessional conduct, particularly in connection with the sexual harassment allegations, even if Kuigoua sent no emails after he was warned. Taken together, there was substantial evidence of Kuigoua's unprofessional conduct.

We reject Kuigoua's argument that, under *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, remand is required if the ALJ erroneously considered T.A.'s testimony from the SPB hearing. *Miller* explained that, if an administrative agency's charges "are not sustained by the evidence," the matter should be returned to the agency

10

if there is " 'real doubt' " that it would have imposed the same penalty absent the unsustained charges. (*Id.* at p. 635.) Here, there was adequate evidence to sustain the sexual harassment charge even without T.A.'s SPB hearing testimony. And in any event, for the reasons we discuss below, we see no real doubt that the Board would have imposed the same penalty without T.A.'s testimony, given the other evidence of Kuigoua's conduct.

We also conclude there was sufficient evidence to support the finding that Kuigoua was grossly negligent and incompetent with respect to his care of Mr. A. Kuigoua acknowledges he may have been "careless" in assuming that someone else would assign an escort to Mr. A, but he asserts that such carelessness does not show his unfitness to practice nursing. Malicse explained, however, that Kuigoua fell short of the standard of care because he failed to identify and effectuate Mr. A's need for an escort, resulting in a fall. Malicse maintained this opinion even after hearing Kuigoua's explanation that he believed someone else was going to handle the situation. Malicse testified that Kuigoua was ultimately in charge of ensuring an escort was assigned and knowing who was assigned, so that he could verify that the duties delegated to an LVN had been carried out correctly. This testimony provides substantial evidence that Kuigoua's conduct reflected gross negligence and incompetence. (See *Clawson v. Board of Registered Nursing* (2021) 72 Cal.App.5th 996, 1004-1005; Cal. Code Regs., tit. 16, § 1443.5.)

We conclude similarly as to Kuigoua's care of Mr. D. Kuigoua argues that he was not required to update Mr. D's care plan after each of Mr. D's falls because the falls did not qualify as a "significant change in condition" warranting updates. But Ancheta explained that conducting such assessments was part of the nursing home's policy. And both Malicse and Ancheta testified that a fall constituted a significant change in condition requiring an updated care plan and fall risk assessment. While Kuigoua disagrees with their opinions, they provided the requisite solid and credible evidence to sustain the judgment. (*Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040,

11

1053 ["Any conflict between [expert's] testimony and that of petitioner . . . must be resolved in favor of the judgment"]; *Clawson v. Board of Registered Nursing*, *supra*, 72 Cal.App.5th at pp. 1005-1006 [interpreting expert testimony to establish standard of care and define breaches of standard]; *Bullis v. Security Pac. Nat'l Bank* (1978) 21 Cal.3d 801, 808-811 [policies or procedures may be substantial evidence of standard of care and breach thereof]; Cal. Code Regs., tit. 16, § 1443.5.)

Finally, we conclude that Kuigoua has failed to show an abuse of discretion in the Board's decision to revoke his license as the sanction for his conduct. "The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion." (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692.) " ' "Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." [Citations.] This rule is based on the rationale that "the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed." ' [Citation.] 'Moreover, "[i]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." ' " (*O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1129-1130.)

In this case, there was sufficient evidence to support the Board's findings of unprofessional conduct, gross negligence, and incompetence, and license revocation is the recommended penalty for such breaches, as shown in the Board's internal guidelines that the Board was required to consider. (Cal. Code Regs., tit. 16, § 1444.5.) Further, even if any one of the individual charges did not warrant license revocation, their cumulative effect was adequate to justify the penalty imposed, particularly because more than one charge carried the risk of harm to patients. The Board's decision makes clear that it considered all the charges when deciding the appropriate penalty. (*Oduyale v.*

12

*California State Board of Pharmacy* (2019) 41 Cal.App.5th 101, 119-122 [cumulating multiple licensure violations to find no abuse of discretion in revocation decision].) Moreover, contrary to Kuigoua's contention, the Board's decision indicates that it did consider mitigating evidence. And the evidence of rehabilitation now cited by Kuigoua—principally that he discontinued his harassing conduct and improper emails when told to stop—is not persuasive enough to establish that reasonable minds could not differ as to the propriety of the penalty. Accordingly, we cannot conclude that the Board's decision to revoke his nursing license was an abuse of discretion.

DISPOSITION

The judgment is affirmed. The Board shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


               /s/
              FEINBERG, J.


We concur:


  /s/
EARL, P. J.


  /s/
RENNER, J.